# EXHIBIT 7

AO 243 (Rev. 01/15)                                                                                               Page 2

MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT

SENTENCE BY A PERSON IN FEDERAL CUSTODY

| United States District Court | District E.D. of Kentucky, at London |
|---|---|

| Name (under which you were convicted): James Alvin Chaney | Docket or Case No.: 6:14-cr-00037 |
|---|---|

| Place of Confinement: Federal Prison Camp, Ashland, Kentucky | Prisoner No.: 17746-032 |
|---|---|

| UNITED STATES OF AMERICA | Movant (include name under which convicted) |
|---|---|
| V. | James Alvin Chaney and Ace Clinique, LLC |

**MOTION**

Eastern District of Kentucky
F I L E D
JUL 24 2020
AT LONDON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

1.  (a) Name and location of court which entered the judgment of conviction you are challenging:

   United States District Court

   Eastern District of KY at London

   (b) Criminal docket or case number (if you know):  6:14-cr-00037

2.  (a) Date of the judgment of conviction (if you know): October 3,2017 amended November7, 2017

   (b) Date of sentencing:  September 29, 2017

3.  Length of sentence:  180 months

4.  Nature of crime (all counts):

   21 U.S.C. §841(a)(1) and 846
   21 U.S.C. §841(a)(1) and 18 U.S.C §2
   21 U.S.C. §856
   18 U.S.C. §1956(h)
   18 U.S.C. §1957
   21 U.S.C. §843(a)(3) and 18 U.S.C. §2
   18 U.S.C. §1349

   18 U.S.C. §1347 and 2
   18 U.S.C. §1035 and 2

5.  (a) What was your plea?  (Check one)

   (1) Not guilty  [X]       (2) Guilty  [ ]       (3) Nolo contendere (no contest)  [ ]

   (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or
   what did you plead guilty to and what did you plead not guilty to?

6.  If you went to trial, what kind of trial did you have? (Check one)       Jury [X]       Judge only [ ]

7.  Did you testify at a pretrial hearing, trial, or post-trial hearing?       Yes [X]       No [ ]

8.  Did you appeal from the judgment of conviction?       Yes [X]       No [ ]

AO 243 (Rev. 01/15)                                                                                                    Page 3

9. If you did appeal, answer the following:

   (a) Name of court:   Sixth Circuit Appellate Court

   (b) Docket or case number (if you know): 17-6167;17-6239;17-6240;17-6314;17-6315;17-6351

   (c) Result:  Affirmed

   (d) Date of result (if you know):   April 11, 2019

   (e) Citation to the case (if you know): United States v. Chaney, 921 F.3d 572(6th Cir.2019)

   (f) Grounds raised:

       1. Constitutionality of search warrant

       2. Jury Misconduct, premature deliberations

       3. Insufficiency of evidence

       4. Sentencing calculations/guidelines

   (g) Did you file a petition for certiorari in the United States Supreme Court?   Yes [X]   No [ ]

     If "Yes," answer the following:

     (1) Docket or case number (if you know):  Unknown

     (2) Result:  Certiorari denied

     (3) Date of result (if you know):  October 7, 2019

     (4) Citation to the case (if you know):  Unknown

     (5) Grounds raised:   1. Jury misconduct, premature deliberations

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications, concerning this judgment of conviction in any court?
   Yes [ ]   No [X]

11. If your answer to Question 10 was "Yes," give the following information:   N/A

   (a) (1) Name of court:

     (2) Docket or case number (if you know):

     (3) Date of filing (if you know):

     (4) Nature of the proceeding:

     (5) Grounds raised:

AO 243 (Rev. 01/15)                                                                                                    Page 4

N/A

(6)   Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes ☐        No ☐     N/A

(7)   Result:

(8)   Date of result (if you know):

(b)  If you filed any second motion, petition, or application, give the same information:    N/A

(1)   Name of court:

(2)   Docket of case number (if you know):

(3)   Date of filing (if you know):

(4)   Nature of the proceeding:

(5)   Grounds raised:

(6)   Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes ☐        No ☐     N/A

(7)   Result:

(8)   Date of result (if you know):

(c)  Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?   N/A

(1)   First petition:        Yes ☐        No ☐

(2)   Second petition:       Yes ☐        No ☐

(d)  If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:   N/A

12.   For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

AO 243 (Rev. 01/15)                                                                                                     Page 5

**GROUND ONE:**   Ineffective Assistance of Counsel
_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

   ( see attachment )

(b) **Direct Appeal of Ground One:**

   (1)  If you appealed from the judgment of conviction, did you raise this issue?
        Yes ☐        No ☒

   (2)  If you did not raise this issue in your direct appeal, explain why:

        Attorney was ineffective for failing to raise this issue.

(c) **Post-Conviction Proceedings:**

   (1)  Did you raise this issue in any post-conviction motion, petition, or application?
        Yes ☐        No ☒

   (2)  If you answer to Question (c)(1) is "Yes," state:

   Type of motion or petition: _____

   Name and location of the court where the motion or petition was filed:

   _____

   Docket or case number (if you know): _____

   Date of the court's decision: _____

   Result (attach a copy of the court's opinion or order, if available):



   (3)  Did you receive a hearing on your motion, petition, or application?
        Yes ☐        No ☒

   (4)  Did you appeal from the denial of your motion, petition, or application?
        Yes ☐        No ☒

   (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?
        Yes ☐        No ☒

28 U.S.C. § 2255  Attachments

GROUND ONE

1. Counsel was ineffective  for failing to notice, object, and preserve for
   appeal the issue of unlawful contact and communication between Juror 116
   and the jury administrator, which prejudiced Chaney and denied him the
   right to an impartial jury; the alternate jurors' contact and communic-
   ation with the jury administrator on multiple occassions violated his
   Sixth Amendment rights to a fair trial by an impartial jury and tribunal.

   a.)  Counsel failed to investigate communications Juror 116 had with
        court personnel, specifically the jury administrator.

   b.)  Counsel failed to investigate communications Juror 116 had with
        other members of the jury.

   c.)  Counsel failed to investigate communications the jury administrator
        had with the rest of the jury.

   d.)  Upon learning of the alternate juror and the jury administrator's
        misconduct during trial, counsel was required to investigate  the
        "Extraneous Influence" issue and develop relevant evidence on the
        issue of prejudice.

   e.)  Counsel's investigation of the extraneous influence was cursory
        and inadequate and resulted in prejudice.

   f.)  Counsel failed to object, argue, and preserve the cursory post-
        trial questionnare of Juror 34 and investigate "who" denied him
        audience with the court after several attempts, during deliber-
        ations.

AO 243 (Rev. 01/15)                                                                                                          Page 6

(6)   If your answer to Question (c)(4) is "Yes," state:   N/A
Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this
issue:
      Ineffective assistance of counsel.

**GROUND TWO:**   Ineffective Assistance of Counsel

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

   ( see attachment )

(b)  **Direct Appeal of Ground Two:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?
Yes ☐    No ☒

(2)   If you did not raise this issue in your direct appeal, explain why:

   Attorney was ineffective for failing to raise this issue.

(c)  **Post-Conviction Proceedings:**

(1)   Did you raise this issue in any post-conviction motion, petition, or application?
Yes ☐    No ☒

Page 6(a)

<u>28 U.S.C. § 2255   Attachments</u>

<u>GROUND TWO</u>

2.   The district court interfered with counsel's assistance to Chaney
     because, upon learning of the jury misconduct and improper and un-
     authorized ex parte communication with the jury administrator, the
     court chose to keep the information from counsel and did not compensate
     for that constructive interference with his right to counsel by in-
     vestigating the improper contact; put simply, the district court denied
     Chaney an opportunity to prove prejudice, at no fault of his.

     a.)   Counsel failed to notice, object, and preserve for appellate
           review the court's flawed analysis implicating F.R.E. 606(b).

     b.)   Counsel failed to notice, argue, object, and preserve for Appel-
           late review, violation of Fed.R.Crim.P. 43, where court person-
           nel had ex-parte communications and gave private jury instructions
           to the panel.

AO 243 (Rev. 01/15)                                                                                    Page 7

(2)   If you answer to Question (c)(1) is "Yes," state:   N/A

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(3)   Did you receive a hearing on your motion, petition, or application?

        Yes ☐       No ☒

(4)   Did you appeal from the denial of your motion, petition, or application?

        Yes ☐       No ☒

(5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

        Yes ☐       No ☒

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this

issue:   Ineffective Assistance of Counsel

---

**GROUND THREE:**   Ineffective Assistance of Counsel

(a)   Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

        ( see attachment )

**(b)  Direct Appeal of Ground Three:**

    (1)  If you appealed from the judgment of conviction, did you raise this issue?

        Yes ☐     No ☒

    (2)  If you did not raise this issue in your direct appeal, explain why:

        Attorney was ineffective for failing to raise this issue.

**(c)  Post-Conviction Proceedings:**

    (1)  Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ☐     No ☒

    (2)  If you answer to Question (c)(1) is "Yes," state:

    Type of motion or petition: _____

    Name and location of the court where the motion or petition was filed:

    _____

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available):

    _____

    (3)  Did you receive a hearing on your motion, petition, or application?

        Yes ☐     No ☒

    (4)  Did you appeal from the denial of your motion, petition, or application?

        Yes ☐     No ☒

    (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

        Yes ☐     No ☒

    (6)  If your answer to Question (c)(4) is "Yes," state:  N/A

    Name and location of the court where the appeal was filed:

    _____

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available):

    _____

Page 8(a)

<u>28 U.S.C. § 2255 Attachments</u>

<u>GROUND THREE</u>

3.   Trial counsel was ineffective for forfeiting a motion to suppress all
   property seized during the search of Ace Clinique, Chaney's resid-
   ence, and the airplane hangar on the basis that the search substan-
   tially exceeded the scope of the warrant and there was flagrant dis-
   regard for the terms of the warrant as to the property to be seized.

AO 243 (Rev. 01/15)                                                                                                          Page 9

(7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

                Ineffective Assistance of Counsel

---

**GROUND FOUR:**    Ineffective Assistance of Counsel

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

    ( see attachment )

(b)  **Direct Appeal of Ground Four:**

(1)  If you appealed from the judgment of conviction, did you raise this issue?

    Yes ☐    No ☒

(2)  If you did not raise this issue in your direct appeal, explain why:

    Attorney was ineffective for failing to raise this issue.

(c)  **Post-Conviction Proceedings:**

(1)  Did you raise this issue in any post-conviction motion, petition, or application?

    Yes ☐    No ☒

(2)  If you answer to Question (c)(1) is "Yes," state:    N/A

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

Page 9(a)

<u>28 U.S.C. § 2255 Attachments</u>

<u>GROUND FOUR</u>

4. Alternatively, appellate counsel forfeited this issue on appeal by
   not raising it as a claim for review following the district court's
   denial of the motion to reopen.

Case: 6:24-cv-00007-REW-HAI   Doc #: 16-7   Filed: 01/23/24   Page: 14 of 90 - Page ID#: 962
Case: 6:14-cr-00037-GFVT-HAI   Doc #: 575   Filed: 07/24/20   Page: 13 of 24 - Page ID#: 10892
Page 9(b)

### 28 U.S.C. § 2255 Attachments

GROUND FIVE

5.  Trial and appellate counsel was ineffective for failing to argue in
    the district court and on appeal that blanket suppression of all evi-
    dence seized was warranted because the agents had exhibited flagrant
    disregard for the terms of the search warrant by conducting a whole-
    sale seizure of Chaney's property, amounting to a fishing expedition
    for the discovery of incriminating evidence.

Page 9(c)

## 28 U.S.C. §¯2255 Attachments

GROUND SIX

6.  Trial and appellate counsel were ineffective for failing to argue, ob-
    ject, and preserve the issue that the FBI witheld relevant and mater-
    ially exculpatory evidence from the magistrate judge in their applic-
    ation for the search warrants.  Specifically, the material evidence
    of the KBML and KY Attorney General's investigations that exonerate
    Chaney of the allegations of healthcare fraud and illegal distribution
    of controlled substances.

Page 9(d)

## 28 U.S.C. §2255 Attachments

GROUND SEVEN

7.   Trial counsel was ineffective for failing to consult and hire the qual-
     ified experts that sentencing counsel (different attorney) retained for
     Lesa Chaney's sentencing hearing, Dr. Arnold Stromberg and Dr. Larry
     Russell, for the purpose of establishing at trial the range of legit-
     mate medical purposes that might be pursued in treating the pain of
     patients and to show that Chaney's prescriptions fell within the usual
     course of professional practice in pursuing treatment of his respect-
     ive patients.

28 U.S.C. § 2255 Attachments

GROUND EIGHT

8.  Trial counsel's failure to investigate the goverments' expert witness-
    es prior to trial was inexcusable and ineffective because their op-
    inions were crucial to the defense.

28 U.S.C. §2255 Attachments

GROUND NINE

9.  Trial and appellate counsel was ineffective for failing to argue and
    preserve material and relevant evidence that a cooperating witness
    (and candidate for KY House of Representatives) presented and intro-
    duced the Kentucky Attorney General to Chaney's office for the purpose
    of extorting financial contributions while Chaney and Ace Clinique
    were under investigation by state prosecutors.

Page 9(g)

<u>28 U.S.C. § 2255 Attachments</u>

<u>GROUND TEN</u>

I0.   Trial and appellate counsels' failure to argue, present, and preserve relevant and material evidence of political intimidation and coersion by a cooperating witness and state official that would have challenged and impeached the credibility and motives of the witness and the investigators. This was inherently prejudicial to the defense and prevented Chaney from producing exculpatory evidence and exposing unethical investigative and prosecutorial misconduct in the jury's hearing.

28 U.S.C. § 2255 Attachments

GROUND ELEVEN


11.   Appellate counsel's own admission of ineffective assistance of counsel

      is prima ficae prejudicial, created procedural default, and adversely

      affected the outcome of the appellate proceedings.

(3)   Did you receive a hearing on your motion, petition, or application?

Yes [ ]     No [ X ]

(4)   Did you appeal from the denial of your motion, petition, or application?

Yes [ ]     No [ X ]

(5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes [ ]     No [ X ]

(6)   If your answer to Question (c)(4) is "Yes," state:   N/A

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:    Ineffective Assistance of Counsel

13.   Is there any ground in this motion that you have not previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

None of the eleven grounds contained in this § 2255 have been litigated in Federal Court.

( see attachment )

14.   Do you have any motion, petition, or appeal now pending (filed and not decided yet) in any court for the you are challenging?     Yes [ ]     No [ X ]

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

AO 243 (Rev. 01/15)                                                                                         Page 11

15.   Give the name and address, if known, of each attorney who represented you in the following stages of the you are challenging:

(a)  At the preliminary hearing:

      Elizabeth S. Hughes

(b)  At the arraignment and plea:

      Elizabeth S. Hughes

(c)  At the trial:

      Elizabeth S. Hughes

(d)  At sentencing:

      Christy J. Love

(e)  On appeal:

      Christy J. Love

(f)  In any post-conviction proceeding:


(g)  On appeal from any ruling against you in a post-conviction proceeding:



16.   Were you sentenced on more than one court of an indictment, or on more than one indictment, in the same court and at the same time?        Yes  [X]        No  [ ]

17.   Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?        Yes  [ ]        No  [X]

(a)  If so, give name and location of court that imposed the other sentence you will serve in the future:



(b)  Give the date the other sentence was imposed: _____

(c)  Give the length of the other sentence: _____

(d)  Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?        Yes  [ ]        No  [ ]


18.   TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*        N/A

      Supreme Court denied certiorari October 7, 2019.

AO 243 (Rev. 01/15)                                                                                                    Page 12

---

\* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

A one-year period of limitation shall apply to a motion under this section.  The limitation period shall run from the latest of –

(1)   the date on which the judgment of conviction became final;

(2)   the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

(3)   the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4)   the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

AO 243 (Rev. 01/15)                                                                                    Page 13

Therefore, movant asks that the Court grant the following relief: The court should grant a new trial.
If a new trial is premised on counsel's failure to file a suppression motion,
the court should order blanket suppression of all of the seized evidence.
In the alternative, the court should grant a hearing on all claims, particul-
or any other relief to which movant may be entitled. arly the Remmer claim, in (public) open
court.

_____
Signature of Attorney (if any)


I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion
under 28 U.S.C. § 2255 was placed in the prison mailing system on _____ 07/09/2020 _____ .
                                                                        (month, date, year)


Executed (signed) on _____ 07/09/2020 _____ (date)


_____
Signature of Movant


If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

/ CERTIFICATE OF SERVICE

Case No.: 6:14-CR-00037

    I, James A. Chaney, declare under the penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct pursuant to 28 U.S.C.S. § 1746; and that on the ___9ᵗʰ___ day of ___JULY___, 2020, I mailed a true copy of the Motion and Memorandum of Law in support of Motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 to the United States District Court, Eastern District at London, by placing same in the United States mail box at Ashland Federal Prison Camp in Ashland, Kentucky.

 

James A. Chaney, pro-se
(Federal Reg. 17746-032)
Federal Prison Camp
P.O. Box 6000
Ashland, KY 41105

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT LONDON


JAMES A. CHANEY, AND
ACE CLINIQUE OF MEDICINE, LLC        )
                                     )
    Petitioners,                     )
                                     )
                                     )
v.                                   )        Case No.: 6:14-cr-00037
                                     )
                                     )
UNITED STATES OF AMERICA,            )
                                     )
    Respondent.                      )


MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO VACATE, SET ASIDE, OR CORRECT
SENTENCE PURSUANT TO 28 U.S.C. § 2255



James A. Chaney (Chaney) is proceeding pro se, without the assistance of counsel, under 28 U.S.C. § 2255 to challenge his conviction and sentence. Accordingly, pro se motions are to receive a comparatively lenient construction by the court. United States v. Castro, 540 U.S. 375, 381-83 (2003); Franklin v. Rose, 765 F.2d 82,85 (6th Cir. 1985)

Chaney owned and operated Ace Clinique of Medicine (Ace Clinique) in Hazard, Kentucky. In June 2010, questions began to surface about whether Ace Clinique was actually functioning as a "pill mill" under the guise of a medical clinic, specifically, whether the clinic was distributing addictive prescriptions in the absence

of a legitimate medical purpose.

A grand jury eventually returned a 256 count indictment that charged Chaney, Ace Clinique, and Lesa Chaney, his wife, with three general categories of crimes: controlled substance charges, money laundering charges, and fraud charges. After a 25-day trial, a jury returned a mixed verdict. The court sentenced Chaney to 180 months in custody and Lesa Chaney to 80 months in custody. Ace Clinique was sentenced to five years probation. On appeal, the Sixth Circuit affirmed the conviction and sentence. United States v. Chaney, 921 F.3d 572 (6th Cir. 2019)

Chaney now argues that his conviction and sentence were entered in violation of the Sixth Amendment to the United States Constitution as the result of ineffective assistance of counsel, both at trial and on appeal. "At the heart of an effective defense is an adequate investigation. Without sufficient investigation, a defendant's attorney, no matter how intelligent or persuasive in court, renders deficient performance and jeopardizes his client's defense." Richter v. Hickman, 578 F.3d 944, 946 (9th Cir. 2009)


I. ᐧ PROCEDURAL BACKGROUND


This § 2255 Motion arises from the criminal prosecution in United States v. Chaney, Case No.: 6:14-cr-00037 (E.D. Ky. 2014).

The origin of the prosecution can be traced back to June 2010. That is when Chris Johnson, an investigator with the O.I.G. of the Attorney General's Office of Kentucky, received information that Chaney occassionally left pre-signed prescriptions slips at Ace Clinique during his absence for other healthcare providers to issue to patients for pain medicine. These were "all" established patients, who received the exact same prescription the prior month. No new patient was ever issued a single prescription for any controlled substance. On June 25, 2010, Chris Johnson and law enforcement officials went to Ace Clinique and interviewed the employees who were

present in the clinic. They also seized the relevant prescription records from the local pharmacies where they were filled.

Johnson reported his findings to the Commonwealth Attorney of Perry County, the Kentucky Board of Medical Licensure (KBML), and the Kentucky Office of the Attorney General (A.G.). After an extensive investigation, spanning a seven-year period, including a detailed review of the practice of patient care at the Ace Clinique, the the investigations terminated with the admonishment that the practice of presigned prescriptions was disfavored, but there was NO violation of the Kentucky Mediacl Practice Act, and the KBML had no published opinion on the issue. Therefore no disciplinary action was warranted. The A.G.'s Office closed it's investigation when none of the allegations of healthcare fraud or illegal distribution of narcotics, brought by Medicaid Auditors could be substantiated. While these investigations were terminated, the F.B.I., at the urging of Johnson, intensified it's probe, by obtaining search warrants for Ace Clinique, the Chaney's residence, and their airplane hangar. The F.B.I. executed the warrants on September 9, 2013.

On October 2, 2104, thirteen months later, and then later, on December 16, 2015, a grand jury returned a second superseding indictment which charged Chaney, Lesa Chaney, and Ace Clinique with numerous offenses, namely, controlled substance charges (Counts 1-64), money laundering charges (Counts 65 and 235-255), and fraud charges (Counts 66-235 and 256). The government eventually dismissed Counts 69, 84, 101, 196, 205, 216, and 219.

On December 15, 2104, the defendants' filed a motion to suppress the evidence seized from the three warrants executed on September 9, 2013. Ultimately, the court allowed the government to use the evidence seized in connection with the warrants executed on Chaney's home and business but suppressed the evidence seized from a search of the airplane hangar.

Trial began on February 29, 2016 and ended on April 18, 2016. The jury delivered a mixed verdict. Chaney was convicted 174 counts. Ace Clinique was convicted of iden-

tical counts, save two exceptions: only he was convicted of knowingly obtaining controlled substances and only Ace Clinique was convicted of making false statements concerning the presigned certificates of medical necessity schemes.

Following the jury's verdict, the court ordered the United States Probation Office to prepare presentence investigative reports. Chaney pressed numerous objections with regard to drug quanity and loss amount that was used to calculate the sentencing guideline range. The court convened a two-day evidentiary hearing. The crux of the parties' positions involved Chaney's argument that drug quantity and loss amount should be calculated only from the counts of conviction, and the government's argument that every Schedule II and III prescription drug which Chaney prescribed during the relevant period of time and every billing to Medicaid from Ace Clinique or a pharmacy filling one of it's prescriptions should be used to calculate drug quantity and loss amount.

Of course, the presentence report used the government's methodology. The court rejected whole cloth adoption of either position, choosing instead to find arbitiarly that sixty percent of the drugs and billings the government used to calculate drug quantity and loss amount were fraudlent. The presentence report arrived at a total offense level of 43 and found that Chaney was a category I offender. Although Chaney's advisory sentencing range was life, the court made a downward variance, sentencing him to 180 months in prison. Ace Clinique was sentenced to five years probation. Final judgement was filed on November 7, 2017. Chaney, Lesa Chaney, and Ace Clinique appealed to the Sixth Circuit. On April 11, 2019 the court affirmed their convictions and sentences.  <u>United States v. Chaney</u>, 921 F.3d 572 (6th Cir. 2019) The Supreme Court denied certiorari on October 7, 2019.

Elizabeth Hughes represented Chaney at trial. On appeal he was represented by Christy Love. Robert Abel represented Lesa Chaney in both courts.


## II.   FACTUAL BACKGROUND

A. AN OVERVIEW

During the course of the 25-day trial, the government presented 59 witnesses; the defense presented 22 witnesses. The government's witnesses included police, government employees, former Ace Clinique patients and employees, codefendants test-ifying under cooperation agreements, and significantly, expert witnesses. The witness-es for the defense were comprised of former patients and employees of Ace Clinique, an attorney, and four medical colleagues as character witnesses, who did not testify regarding any specific instance of care of any patient. In addition, Chaney testified on his own behalf. There were NO "experts" consulted or called to testify on behalf of the defense.

Chaney's defense was that he did use presigned prescriptions at times for the sake of administrative convenience, but all of them were for legitimate medical needs of well-established patients. Chaney also argued that the altered drug screens were in fact accomplished without his knowledge, he adhered to standard protocol for the frequency of drug screens that were published at the time (KBML), he had several healthcare providers at his clinic to properly manage a high volume of patients, and he was not under the influence of medication in his role as the primary physician for Ace Clinique. Chaney also countered claims of unqualified staff and up-coded billing. Furthermore, after investigator Chris Johnson visited the clinic on June 25, 2010, Ace Clinique underwent extensive compliance training on these issues with an attorney. The government could NOT show a single presigned prescription after June 25, 2010.

B. JUROR MISCONDUCT

   1.   JUROR 116

As the trial entered its fifth day, the jury administrator (J.A.) approached the clerk and the clerk approached the trial judge about Juror 116, an alternate juror, explaining that Juror 116 expressed "some frustration with the process" and reported

"concerns about how serious[ly] the jury was taking their duty." <u>United States v. Chaney</u>, 211 F.Supp.3d 960,976 (E.D. Ky. 2016)

The judge told the jury that if any issues related to the jury instructions arose, they should report those to the court. The judge did NOT tell defense counsel that a juror had contacted the court and raised concerns, however. Moreover, Juror 116 did have additional issues with which she approached the J.A., but the J.A. instructed her to personally confront the other jurors herself, without intervention from the judge.

After trial, Juror 116 contacted Chaney's attorney, Elizabeth Hughes, to complain of misconduct. Counsel contacted the trial judge and the judge eventually conducted an in-camera interview with the alternate, without the defendant or his counsel. Defense counsel made no objection or request to be present. During the interview, Juror 116 told the judge, "I actually wanted to talk with you when it was - I had told 'Renee' [presumably the J.A.] - I talked to her twice, and the last time she told me that - that she wasn't going to tell you that I - that I had called, and that for me to just ask the jurors not to do that myself, and I didn't feel that was appropriate for me to ask them." (ECF 291, Sealed Transcript of In-Camera Interview, at 4) Juror 116 said that she was <u>concerned about a fair trial</u>, explaining that she had heard two jurors prematurely discussing Chaney's case, and referring to matters such as "his house, Dr. Chaney's house and everything." (Id.) When the alternate confront- ed the other jurors, they became argumentative and said they could indeed discuss the matter.

However, a fellow juror intervened to voice agreement with her that the discuss- ions were not permitted and ran afoul of the judge's instructions concerning deliber- ations; the discussions nonetheless obviously continued. (Id.) Juror 116 informed the judge that she told "Renee" - the J.A. - about the situation, and she replied that "[she] would approach the other jurors', and she did!" (Id.) It is therefore

established that "Renee" gave unlawful ex-parte extrajudicial instruction and advise to the panel.

But the misconduct occurred again. When Juror 116 informed the J.A. of the misconduct the second time, she told Juror 116 that she was not going to advise the judge. In fact, the J.A. told Juror 116 to take matters into her own hands and admonish them. (Id.)  At one point the alternate explained that some of the jurors were discussing the way an elderly witness had been treated on the stand, stating that she "felt it was inappropriate, you know, to be talking about that." (Id. at 7)  The alternate also referred to another incident where another juror remarked on knowing how many lights were in the ceiling because of boredom during a particular part of the trial. (Id.)

The trial judge concluded that there were "no concerns about any external influences on the jury's deliberation process" and further investigation into the jurors' conduct was unwarranted because "Rule 606(b) expressly prohibits post-verdict investigation of any other influence." (ECF 371, Page ID 5928)  Raising the issue of jury misconduct involving "premature deliberations" and the court's failure to give notice at the time the misconduct occured, Chaney and Ace Clinique brought a motion for a new trial, pursuant to FRCP 33.

The judge framed the legal analysis as "what the court knew and when the court knew it", and explained that:

> On the fifth day of the Chaney's trial, a court clerk briefly relayed to the court some information that she received from the J.A. and one of the trial's alternate jurors. The administrator told the court clerk – and the clerk then told the court that this alternate had expressed "some frustration with the process" and "concerns about how serious[ly] the jury was taking their duty." The clerk did not provide any detail about the specific comments and or behavior that apparently caused the alternate's concern, and the alternate did not report any of these concerns to the court. Armed with only a skeletal, third-hand allusion to one alternate's frustration, the court determined that further investigation would be premature.

United States v. Chaney, 211 F.Supp.3d 960, 975-76 (E.D. Ky. Sept. 30, 2016)

2.   JUROR 34

On July 22, 2016, following the verdict, Chaney and Lesa Chaney sought permission to contact a juror on the basis of an affidavit from Chaney's brother, Robert "Butch" Chaney, relating that he had been approached by a juror that "stepped aside" as the jury foreperson because of the rancor and disagreement that broke out amongst the jurors during deliberations.  (ECF 353-1, Affidavit, Page ID 5654-55)  According to the affidavit, the foreperson "had made several attempts to speak with the judge about the jury's troubles during the deliberations but was put off each time."  (Id., Page ID 5655)  It is still unknown "who" refused his several attempts for audience with the judge. The affiant averred that the foreperson said one juror stated that all defendants were guilty and it was wrong to prescribe narcotic medications to terminally-ill patients. (Id.)  The affiant also stated that the replacement foreperson was upset about a print rug or carpet shown in a picture. (Id.)  Unsuprisingly, this is the same sort of testimony that was elicited by a corrupt cooperating witness, Benny Ray Bailey, Jr.; obviously inflaming the passions of the jury. Finally, the affiant related a comment to the effect that "someone told the jury that when their vote got to 7-5, that was good enough for a verdict." (Id.)

Discerning that "jurors may have been subject to improper and extraneous influence with respect to the unanimity requirement for their verdict" (ECF 357, Page ID 5726), the trial judge permitted the Chaney's to submit a jury questionnare to the court for preapproval. After submission, the court edited the proposed questionnare and directed "unknown" court personnel to contact Juror 34 to schedule a time to complete the form. (ECF 365, Page ID 5884-85)  Based on the answers to the cursory and limited questionnare, the judge found that matters related to juror unanimity extended to internal influences regarding the deleberative process.  (ECF 371, Page ID 5927 n.16)  Critically, however, the question of "who" prevented him audience with the judge, "who" insisted on a quotient verdict, and "who" met and administered

the questionnare and with what physical demeanor was he subjected, remain unknown.

C.   DIRECT APPEAL

On direct appeal, Chaney sought permission for a new trial based on jury mis-conduct, where counsel only argued premature deliberations, controlling the issue. Chaney, slip op. at 30.  The Sixth Circuit found that "[t]he court did not investi-gate the concerns directly, nor did it alert counsel to the concerns." (Id.) Rather, the court's response was to inform the jurors that if they had "any issues" about the "jury instructions," they should "bring those to [the court's] attention." (id.) Despite the invitation, "[t]he district court heard nothing further during the trial." (Id.)

"The in-camera interview revealed details about the initial 'concerns' that the district court was told via the court clerk and jury administrator." (Id.)  The court was informed of the misconduct on the fifth day of trial. The in-camera inter-view, however, did not occur until April 25, 2016, a substantial passage of time under the circumstance. Focusing specifically on Juror 116's contact with the J.A., the court observed that "[i]t is unclear what exactly the alternate described to the ad-ministrator." (Id. at 31)

The Sixth Circuit held that the "district court acted recklessly by choosing to keep information about potential juror misconduct from defense counsel." (Id. at 32) It denied reversal of the verdict, however, because Juror 116 was given a chance to air out all her grievances, and nothing came close to conduct that would have warrant-ed a new trial." (Id.)

D.   EXPERT WITNESSES FOR SENTENCING

At sentencing, the determinative issues centered on the quantity of drugs at-
tributable to the clinic under the "pill-mill" conspiracy and the loss amount attrib-
uatble to healthcare fraud. The Sixth Circuit explained the diametric positions that
split the defense and the government this way:

> Put simply, the defense argued that drug quantity and loss
> amount should be calculated from the counts of conviction
> only; the government argued that every Schedule II or III
> prescription drug Ace prescribed during the relevant time
> period and every billing to Medicaid from Ace Clinique or
> a pharmacy filling to an Ace Clinique prescription should
> be used to calculate drug quantity and loss amount.

Chaney, slip op. at 4.

The Chaney's objected and presented testimony from two "expert witnesses",
Dr. Arnold Stromberg, Chair of the University of Kentucky Department of Statistics,
and Dr. Larry Russell, a Board-certified family physician practicing in Henderson-
ville, North Carolina. Chaney relies on their testimony as a proffer of evidence in
support of his argument that his trial attorney was ineffective for failing to con-
sult with an expert to present to the jury evidence that tended to show Chaney's
innocence, tended to undermine the government's case, or raised a reasonable doubt
as to his guilt.


### III.   GROUNDS FOR RELIEF


1.   Counsel was ineffective for failing to notice, object, and pre-
     serve for appeal the issue of unlawful contact and communication
     between Juror 116 and the jury administrator, which prejudiced
     Chaney and denied him the right to an impartial jury; the alter-
     nate juror's contact and communication with the jury administrator
     on multiple occassions violated his Sixth Amendment rights to a
     fair jury and tribunal.

     a.   Counsel failed to investigate communications Juror 116 had
          with court personnel, specifically the jury administrator.

     b.   Counsel failed to investigate communications Juror 116 had
          with other members of the jury.

     c.  Counsel failed to investigate communications the jury admin-
istrator had with the rest of the jury.

     d.  Upon learning of the alternate juror and the jury administrator's
misconduct during trial, counsel was required to investigate the
"extraneous influence" issue and develope relevant evidence on
on the issue of prejudice.

     e.  Counsel's investigation of the extraneous influence was cursory
and inadequate and resulted in prejudice.

     f.  Counsel failed to object to the cursory post-trial questionnare
of Juror 34 and investigate "who" denied him audience with the
court after several attempts, during deliberations.

2.  The district court interfered with counsel's assistance to Chaney
because, upon learning of the misconduct and improper and unauthor-
ized ex-parte communications, the court choose to keep the informa-
tion from counsel and did not compensate for that constructive in-
terference with his right to counsel by investigating the improper
contact; put simply, the district court denied Chaney an opportunity
sua sponte, to prove prejudice, at no fault of his own.

     a.  Counsel failed to notice, object, and preserve for appellate
review the district court's flawed analysis implicating F.R.E.
606(b).

     b.  Counsel failed to notice, argue, object, and preserve for appel-
late review, violation of F.R.C.P. 43, where court personnel
had ex-parte communications and gave private jury instructions
to the panel, without the presence of the defendant or counsel.


    Chaney discusses these substantive claims together for the purposes

of argument.

    The Sixth Amendment guarantees the right to effective assistance of counsel

in criminal proceedings. Yarbrough v. Gentry, 540 U.S. 1,5 (2003)(per curiam)  To

obtain reversal of a conviction, Chaney must prove that (1) counsel's performance

"fell below an objective standard of reasonableness", Strickland v. Washington, 466

U.S. 668,688 (1984), and (2) counsel's deficient performance prejudiced the defend-

ant. (Id. at 697, 691-92)  He must show that counsel's errors were prejudicial and

deprived him a fair trial, "a trial whose result is reliable," (Id. at 687)  "This

burden is met by showing a reasonable probability that the outcome of the proceeding

would have been different but for counsel's errors." (Id. at 694);  <u>Williams v. Taylor</u>, 529 U.S. 362,391 (2000)

Relevant here is Chaney's Sixth Amendment juror misconduct argument based on four occurrences: first, that Juror 116 contacted the J.A. concerning premature deliberations; second, that the juror contacted and communicated with the J.A. and was given <u>ex-parte private instructions</u> to "tell [the other jurors'] not to do that"; third, the J.A. gave <u>ex-parte private instruction</u> to other, perhaps the whole panel and; fourth, Juror 34 "made several attempts [during deliberations] to talk to the judge but was "<u>put off each time</u>."

Critically, counsel did not notice, object, or appeal the "extraneous influence" issue. The Sixth Circuit noted on direct appeal that the district court "acted reck- lessly by choosing to keep information about potential jury misconduct from defense counsel." <u>Chaney</u>, slip op. at 32.; and the defendants' rely exclusively on <u>U.S. v. Resko</u>, arguing premature deliberations.

One of the primary claims being made is counsel's forfeiture of the "extran- eous influence" issue, where counsel failed to conduct an investigation and request a <u>Remmer</u> hearing to determine what, if any, prejudice resulted from these events and it was never presented on appeal as a Sixth Amendment fair trial - tribunal issue or decided by the court.

"The Confrontation Clause of the Sixth Amendment provides defendants the right to be present at all critical stages of criminal proceedings." <u>Illinois v. Allen</u>, 397 U.S. 337,338 (1970)  The Due Process Clause of the Fifth Amendment supplements this right by protecting the defendants right to be present to confront witnesses against him, where communications between the (court) and the jury will violate de- fendant's right when the defendant "has a relation, reasonably substantial to the fullness of his opportunity to defend against the charge." <u>United States v. Gagnon</u>, 470 U.S. 522,526 (1985)  The Supreme Court routinely reverses convictions where

evidentiary rules deprive defendants of the right to confront witnesses." Davis v. Alaska, 415 U.S. 308,319, (1974)

As precisely illuminated in United States v. Arriagada, 437 F.2d 487,488 (4th Cir. 1971), cert denied, 405 U.S. 1081 (1971); FRCP 43 requires the presence of the defendant at "every stage of the trial." "Such rule, manifestly proscribing any communications by the court with the jury, whether before or after it has begun it's deliberations, without the presence of the defendant." Furthermore, "any departure from the rule [RULE 43] is error and unless the record completely negatives any reasonable possibility of prejudice, mandates a new trial." (emphasis added)

Critically, trial and appellate counsels' failure to notice, argue, and object to the "private jury instructions" the jury administrator had initially with Juror 116 and ultimately the whole panel violated the defendants Statutory (FRCP 43(a)) and Constitutional right to be present at all stages of the trial, where [he] has a reasonable opportunity to defend against the charges brought against him. Otherwise, court personnel's ex-parte private communications with the jury is pregnant with possibilities for error. Because neither Chaney nor his counsel were present during the J.A.'s colloquy with the jury (and no record was made), defendants' "had no opportunity to correct any possible error in the district court's oral instructions." United States v. Smith, 31 F.3d 469 (7th Cir. 1994) "The trial court's instructions, delivered ex-parte, deprived defendants' of any opportunity of clarifying the ambiguity created by the supplemental instructions." United Staes v. Cowan, 819 F.2d 89,93 (5th Cir. 1987)

Furthermore, FRCP 43(a) also "provides a broader right to be present than the right recognized under the Constitution." Young v. Herring, 938 F.2d 543,557 (5th Cir. 1991), cert. denied, 112 S.Ct. 1485 (1992); United States v. Brown, 571 F.2d 980,986 (6th Cir. 1978); United Staes v. Riddle, 249 F.3d 529,534 (6th Cir. 2001) These private "communications between third parties [J.A.] and jurors .....

render a criminal verdict vulnerable because they are prima facie incompatible with the Sixth Amendment." (Smith, supra)  Trial and appellate counsel's unreasonable forfeiture of these guaranteed rights "effectively" rendered Constitutional infirmity resulting in irrefragable prejudice.

The court in United Staes v. Harris, 9F.3d 493 (6th Cir. 1993) held, "various rationales for this right aim at preventing prejudice to the defendant. Communications between a judge (court) and the jury without counsel promotes interference with appellate review by preventing the parties from realizing the context in which the remarks were made. Neither the parties nor the appellate court are apprised of important nuances such as the court's tone of voice or physical demeanor." Moreover, "statements of the court's views, left unchallenged may disturb 'the delicate balance of legal principles' set forth in the original instructions." United States v. Burns, 683 F.2d 1058,1059 (7th Cir. 1992)

These principles were more recently reinscribed in the Sixth Circuit habeas case, Wilson v. Warden, 2015 U.S. Dist. LEXIS 114683, where it held, "the trial court is not permitted to conduct instructions, or direct or indirect communications with the jury outside the presence of the petitioner or his counsel." As such, "the petitioner was prejudiced because he was unaware of the content of the communications between the trial court and the jury and could not challenge facially any of the instructions of the content thereof." As in Chaney, this is particularly problematic since there is an incomplete record of the ex-parte communications and conspicuosly, a non-existent record of the "private jury instructions", whereby any reasonable determination that no prejudice existed could be deduced, or harmlessness made to appear. What is known with confidence and abundantly clear from the record, "Renee" had unlawful ex-parte communications with the panel, and gave private jury instructions as well, and Chaney has been deprived of his Statutory and Constitutional rights at the hands of inept counsel.

To be clear, the fundamental argument being made is trial and appellate counsel rendered ineffective assistance by failing to notice, argue, object, and preserve for appellate review obviously apparent dispositive facts in evidence that were inherently prejudicial and adversely affected the outcome of the proceedings, namely :

1.) Juror 116's revelations that [she] and the jury administrator had unlawful ex-parte communications at least twice, and "Renee" gave private jury instructions to the panel that obviously concerned "matters before the court", thus staisfying the "external influence" issue of F.R.E. 606(b). Counsel failed to shine the light on what has been cloaked in darkness, ab initio - "Renee", the J.A., is the external source".

2.) Counsel's failure to object, litigate, and preserve the government's and court's erroneous finding of fact and misapplication of F.R.E. 606(b), proclaiming there was no "external influence".

3.) Counsel's failure to notice, argue, litigate, and preserve violation of FRCP 43, where the J.A. gave ex-parte private jury instructions to Juror 116 and the panel.
The misapplication of law implicating F.R.E. 606 effectively resulted in the above cascade of errors causing irreparable harm and prejudice, preventing defendants' from a new trial, or at a minimum, an evidentiary hearing. Counsel's unreasonable performance was not only constitutionally ineffective, but detrimental.

Although trial counsel putforth a broad and rudimentary "interest of justice" argument pursuant to FRCP 33, it did NOT include the indici of the above issues, but rather counsel seemingly agreed with the court's flawed analysis of F.R.E. 606. (ECF 325, Page ID 5719)  From the beginning, the only issue argued was defendant's right to "notice" at the time the court was first made aware of the misconduct - "premature - deliberations", without even mentioning the erroneous implication of RULE 606(b), upon which the inquiry necessarily turned. Without notice and litigation of this fundamental manifest Constitutional plain error and abuse of discretion, trial counsel's motion for a new trial and appellate counsel's opening brief were "dead on arrival".

Chaney must now be afforded the opportunity counsel actually (and the district court constructively) denied him at trial: the opportunity to prove prejudice. See Ewing v. Horton, 914 F.3d 1027,1032 (6th Cir. 2018)

The touchstone issue is counsel's unreasonable strategy to "ignore" and abridge defendant's Statutory and Constitutional rights. Counsel's failure to notice, argue, and object to the governments attempts at abrogating F.R.E. 606(b) and abridgement of the issues by erroneous finding of fact and misapplication of law is equally and ineffably egregious. Perhaps most importantly, counsel failed to notice, object, and preserve the "abuse of discretion that occurs when a district court relies on clearly erroneous finding of fact, improperly applies the law, or uses erroneous legal standards." United States v. Washington, 584 F.3d 693,695 (6th Cir. 2009)  Suprisingly, appellate counsel simply "ignored" the issues altogether, remaining mute, despite being well aware of the dispositive facts. Counsel's unreasonable and inherently prejudicial failure to handle these issues "effectively", as an adversary to the government, "strikes at the fundamental fairness of the proceedings." Cf. United States v. Causey, 834 F.2d 1277,1281 (6th Cir. 1987)

The "prejudice" in these instances are readily apparent. Respondent was "effectively", albeit Constitutionally deprived, a Remmer hearing, and notice and litigation pursuant to violation of F.R.C.P. 43, due to clearly erroneous finding of fact, misapplication of law, and irrefragable, prejudicial ineffective assistance of counsel.

Concerning trial counsel's anemic and infirm argument for a new trial (ignoring the dispositive facts), the court and government cite, United States v. Tanner, 487 U.S. 107,125 (1987) and F.R.E. 606(b) as controlling in their argument to deny relief. Specifically, the trial court pronounced, "because the alternate's complaints revealed no concerns about any external influence on the jury's deliberative process, and because Rule 606(b) expressly prohibits investigation of any other influence on

16

this process, the court denied that request." (DOC 371, Page ID 5928)   The government also noted, "exceptions to this rule (606(b)) exists only in situations in which an external influence was alleged to have affected the jury," quoting Tanner. (DOC 311, Page ID 3502)

Critically, however, Tanner is instructive, where the analysis and misapplication of law to the trier of fact in Chaney, were thoroughly errant, "recklessly" failing to recognize ex-parte communications and private jury instructions with a juror by court personnel, is specifically an example to the exceptions under F.R.E. 606(b): "an outside influence was improperly brought to bear upon any juror." (See Parker v. Gladden, supra, cited in Tanner)   Counsel's failure to notice and object to this manifest Constitutional and plain error prohibited defendant's from an evidentiary hearing where an opportunity to prove prejudice is afforded. This error also prevented an inquiry into violation of FRCP 43. Despite concerted attempts at abrogation and abridgment, respondent was in fact entitled to further inquiry, namely a Remmer hearing. Reasonably effective counsel would have recognized the external source (Renee), identified her having ex-parte communications with the panel concerning matters before the court and litigated appropriately. The record, far from necessarily being complete, is NOT confusing, but rather clear on these issues.

Instead, trial counsel errantly capitulated, seemingly in agreement with the court and government, stating, "defendants are NOT requesting the jury testimony be taken in violation of FRE 606(b)" (ECF 325 Page ID 5719)....again emphasizing "premature deliberations" as the dispositive issue upon which the inquiry turned. In fact, the "external influence" sanctioned, not obstructed, defendants rights under Rule 606(b). Trial counsel further argued errantly, "the inquiry was outside the purview of Tanner, but rather, U.S. v. Resko, 3F.3d 684,691 (3rd Cir. 1993), which involve premature deliberations, controlled.

The record is abundantly clear, the keystone issues just mentioned have NEVER

been before any court: not a scintilla of the material facts have been considered or adjudicated by the court for one simple reason, they were never putforth as the court and government concede. Therefore, res judicata is not implicated. Assuming arugendo, these serious errors prove inherently prejudicial, failing to subject the government to adversarial testing, and "but for" these paramount arguments being noticed and litigated by reasonably effective counsel, there is more than a reasonal probability that the outcome of the proceedings would have differed; satisfying both prongs of Strickland.

Competent counsel in the process of formulating reasonable strategy, would have been cognizant of the J.A., acting as on officer of the court, contumaciously violated her basic duties and oath of office by having ex-parte communications and failing to notify the court each time a juror(s) requested audience. (Jurors 116 & 34) These deliberate and willful acts violated the integrity of the judicial system and prevented the defendants' from being tried before an impartial jury and tribunal. The J.A.'s contreptemptous behavior is indicative of the court's "recklessness" by failing to adequately supervise court personnel which was noticed by the appellate court.

Critically, the trial court failed to recognize that Juror 116 (who was also worried about a fair trial and "scared to death") positively identified "Renee" as having ex-parte ("third party") communications with [her] about matters before the court, at least twice, and giving "private" instructions to the panel...noting, "and she did" ! (In-camera interview of Juror 116 - attached) Despite this finding of fact, the court nor counsel, ever recognized the "external influence" (Renee), or the manifest Constitutional or plain error resulting from the errant misapplication of FRE 606(b). Appellate counsel, "drinking from the same cup", on opening brief, merely continued the same weak and infirm argument as trial counsel. Completely ignoring and sacrificing Statutory and Constitutional Law, counsel was successful in the ab-

rogation and evisceration of FRE 606(b).

As concisely stated and pertinent to the case at bar, Moore v. Knight, 386 F. 3d 396.3(7th Cir. 2004), "even if the evidence were sufficient to support the court's factual findings, these findings never addressed what the jury was told in the ex-parte communications. This half of the inquiry is a necessary component of any det-ermination of prejudice." In addition, "the verbal communications of a bailiff with the jury remains under the purview of Remmer." Deserving reiteration, the appellate court in Chaney, noted, "it's unclear what the alternate told the jury administrator." ( It's equally unclear what "Renee" told the panel in the private instructions!); and admonished the court for acting recklessly.

Trial and appellate counsel took presumptious liberty "ignoring" clearly strong-er arguments starring them in the face, in favor of weaker ones, effectively barring Sixth Circuit review and preventing defendants from obtaining a new trial, or at a minimum, an evidentiary hearing.

Finally, but with belated negligence, appellate counsel did in a perfunctory manner, mention the external influence issue, but not until the reply brief; as the government noticed. This cursory mention of dispositive facts was promptly objected to by the U.S.A. during oral arguments, where Ms. Harris empathetically went on record, "I don't think any allegation of the second decision of the post-verdict was improper, the court investing Rule 606 governed." "There was never [mention of] external influence until the reply brief in this case, which would be abandoned by the defendants.", and "there has never been any suggestion until the reply brief [that] somewhat the administrator was an influence on this." (Appellate Oral Argu-ments: 01/16/2019)

Furthermore, co-defendant's attorney argued on direct appeal (as on Rule 33), "the jury misconduct here involves discussions and consideration of evidence and premature commencement of deliberations." (Document 27, Page ID 66, Appelate Brief)

The government also noted that "the lower court implicated Rule 606(b) which limited the investigation into jury impeachment." (Document 41, Page ID 112, U.S.A. Appellate Brief)  Finally, the Sixth Circuit noted, "The defendants rely nearly exclusively on U.S. v. Resko to support their argument that the alleged jury misconduct necessitated a new trial." (Appellate Court Opinion, Page ID 31(a), 04/11/2019)  Further evidence of these historical facts in evidence, includes appellate counsel's prejudicial confession in an email dated 04/17/2019, "But you have some pretty good arguments for a 2255, including potentially my failure to address the external influence issue." (Exhibit #5)

   For the sake of argument, it should be remembered that the deliberate and willful acts of the J.A. defied [her] independent authority with respect to purely administrative and ministerial duties, as an officer of the court. Specifically, her actions with the panel is a demonstration of insubordinate conduct evincing an abuse of the functions of her duty. More importantly, it is evidence of a "reckless" encroachment of defendant's Fifth and Sixth Amendment rights to a fair trial and tribunal. The J.A. serves at the pleasure of the court. The deliberate and willful defiance of [her] obligations as an officer of the court, and the court's failure to "supervise" her activity, represents clear and substantial contumacious conduct, and abuse of the administration of justice that diminishes the integrity of the judicial process. "The Due Process Clause of the Fifth Amendment entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." Marshall v. Jerrico, Inc., 466 U.S. 238,242 (1980)  Neutrality ensures that life, liberty, or property will not be taken on the basis of erroneous or distorted conception of the facts or law." (Id.)  In addition, 28 U.S.C. § 607 states, "an officer or employee of the administrative staff shall not engage directly or indirectly in the practice of law in any court of the United States." Surely, ex-parte private jury instruction, concerning matters before the court, and the arbitary and capricous denial of an empaneled

jurors' (116 & 34) from audience with the court, interfering with the court's dir-
ectives are inclusive; begging the question, who was actually in charge of the panel ?
certainly the discussions were NOT innocous, ministerial, or housekeeping in nature.
(Cf. Rushen v. Spain, (1986))

The Fifth and Sixth Amendments guarantee Chaney the right to a trial by an im-
partial jury. See U.S. Const. Amen. VI; Irvin v. Dowd, 366 U.S. 717,722 (1961)(In
essence, the right to a jury trial guarantess to the criminally accused a fair trial
by a panel of impartial, indifferent jurors. The failure to accord an accused a fair
hearing violates even the minimal standards of due process."); Turner v. Louisiana,
379 U.S. 466 471-72 (1965)  An impartial jury is one that arrives at its verdict
"based upon the evidence developed at trial" and without external influences. Irvin,
366 U.S. at 722.

Chaney also argues that counsel ignored clearly established federal law and for-
feited the opportunity to attach a presumption of prejudice upon the showing of the
"external influence - Renee" on the jury, the Remmer presumption. Remmer v. United
States, 347 U.S. 227 (1954)  The fundamental argument being made here is that counsel
failed to conduct an investigation and request a Remmer hearing to determine what, if
any, prejudice resulted from these events was neither presented on appeal or decided
by that court.

It is clearly established under Supreme Court precedent that an external influ-
ence affecting the jury's deliberations violates Chaney's right to a fair trial. See,
e.g. Parker v. Gladden, 385 U.S. 363,364-66 (1966)(per curiam); Remmer, 347 U.S. at
229.  Especially troubling are private communications between a juror and a third
party. In Parker, the Supreme Court clearly stated that private communications between
an outside party and a juror raise Sixth Amendment concerns. 385 U.S. at 364.  Indeed,
it was well established at the time of trial that "private talk, tending to reach the
jury by outside influence" is Constitutionall suspect. (Id. at 364)  The Supreme

Court recognized this as early as 1892, when it declared that, "[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least until their harmlessness is made to appear." Mattox v. United States, 146 U.S. 140,150 (1892) "[C]ertain types of misconduct posses such a high potential for prejudice that they are considered prima facie prejudicial," Gov't of V.I. v. Gereau, 523 F.2d 140, 154 (3rd Cir. 1975) "Remarks made by jury attendants to jurors, where those remarks relate to the jury's deliberations, are usually of this latter type." (Id.)

In light of this important constitutional background, the Supreme Court in Remmer created a rebuttable presumption of prejudice applying to communications or contact between a third-party and a juror concerning the matter pending before the court and the jury. Remmer, 347 U.S. at 229.  The Remmer presumption was adopted because the potential for mischief is so great when a third-party establishes private, extrajudicial contact with a juror.

The Court further noted that when allegations of juror partiality comes to light, "[t]he trial court should not decide and take final action ex-parte on information such as was received in this case." Remmer, 347 U.S. at 229-30.  Instead, the trial court "should determine the circumstance, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." (Id. at 230)

Thus, Remmer clearly established not only a presumption of prejudice, but also a defendant's entitlement to an evidentiary hearing, when the defendant presents a credible allegation of communication or contact between a third-party and a juror concern-the matter pending before the jury.

The Sixth Circuit has applied the Remmer presumption both on direct appeal and on § 2254 review.  See Lanier, 870 F.3d 546 (2017)(direct appeal); Ewing, 914 F.3d 1027 (2017)(28 U.S.C. § 2254 review)  Trial and appellate counsel should have been aware

that the Remmer presumption at the time of trial and now remains the landmark case in the Sixth Circuit. To be clear, in Ewing, the Sixth Circuit held that "where a petitioner has shown a colorable claim of juror bias but has been denied the opportunity to prove actual prejudice," the Supreme Court and our court have repeatedly ordered the district court to conduct a Remmer hearing to determine what, if any, actual impact the outside information had on the jury'd verdict." 915 F.3d at 1031 (citing, inter alia, Remmer, 347 U.S. at 230; Smith v. Phillips, 455 U.S. 217-218 (1982); United States v. Harris, 881 F.3d 945,953 (6th Cir. 2018))

The central theme of the court's precedent is that in cases where the danger is not one of juror impairment or predisposition, but rather the effect of extraneous communication upon the deliberative process of the jury, the Remmer presumption applies. In Chaney, the district court did exactly what the Supreme Court said trial courts should not do - "decide and take final action ex-parte on [the] information... [that] was received in this case." 347 U.S. at 229-30 - which in turn caused the Sixth Circuit to admonish the "district court [for] act[ing] recklessly by choosing to keep information about potential juror misconduct from counsel," Chaney, slip op. at 32, and instead of "determining the circumstances...in a hearing with all interested parties permitted to participate," Remmer, 347 U.S. at 229-30, the court confessed in response to the motion for a new trial that, "[a]rmed with only a skeletal, third hand allusion to one alternate's frustration," the court unilaterally "determined that further investigation would be premature." Chaney, 211 F.Supp,3d at 975-76

Chaney also notes that Remmer established a separate, but related requirement that a defendant is entitled to a hearing when the defendant presents a credible allegation of communications or contact between a third party and a juror concerning the matter pending before the jury. See United States v. Shackleford, 777 F.2d 1141, 1145 (6th Cir. 1985) (explaining that "[w]hen possible juror misconduct is brought to the trial judge's attention, he has a duty to investigate and to determine wheth-

er there may have been a violation of the Sixth Amendment.")

Post - Remmer Supreme Court case law has confirmed that due process require a hearing to alleviate concerns of juror partiality. In Phillips, the court explained that it "has long held that the remedy for allegations of juror impartiality is a hearing in which the defendant has the opportunity to prove actual bias." 455 U.S. at 215.; see also Porter v. Illinois, 479 U.S. 898,900 (1986)(Marshall,J., dissenting from denial of writ of certiorari)(citing Remmer and Phillips and explaining that "[w]hen a substantial question of juror bias is presented to the trial court, ... we have held that the defendant is entitled to a hearing with all interested parties permitted to participate.")

The requirement that the district court conduct a hearing to determine juror partiality is rooted in the Constitution :

> Due Process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in Remmer and held in this case.

Phillips, 455 U.S. at 217. This decision makes clear that depending on when allegations of improper juror communication or contact are brought to the trial court's attention, the hearing requirement may be satisfied post-trial, like in Remmer, or during trial. Here, the improper contact and communications Juror 116 first had with the J.A. came to the district court's attention five days into a 25-day trial, Counsel could have requested a Remmer hearing during trial. Granted, the court acted "recklessly" withholding the information, but that simply swung the balance of responsibility for seeking a hearing post-trial, either in the motion for a new trial or on "direct" appeal. Chaney was entitled to a hearing under clearly established federal law because there was a credible allegation of communications and contact between a third-party (the J.A.) and the jury with regard to matters pending before the jury.

Trial and appellate counsel unreasonably decided to limit the argument of jury mis-conduct to "premature deliberations" and failed to notice, object, and preserve the trial court's flawed analysis implicating F.R.E. 606(b). (ECF 371, Page ID 5982)  It is uncontested that Juror 116 had "intentional" and unlawful communications with the J.A., who in turn had unauthorized ex-parte contact with the rest of the panel. There is "no confusion" on these facts. It is firmly established Supreme Court precedent that court personnel's unauthorized communication with any member of the jury, about any matter before the court and jury (and not merely ministerial) is considered an example of "external influence" under the exceptions of F.R.E 606(b) and thus admis-sible. See United States v. Tanner, 483 U.S. 107 (1986)(citing inter alia Parker v. Gladden, supra.)  Trial and appellate counsel's ignorance of the law in this instance was inherently prejudicial, and "but for" these serious errors, the outcome of the proceedings would have differed. "Effectively" counsel denied Chaney due process under the Fifth and Sixth Amendments. Counsel failed to recognize that Supreme Court prece-dent required a Remmer hearing to allow defendants an opportunity to prove bias.

To be entitled to the Remmer presumption and a Remmer hearing, a defendant must show "that an extrinsic influence has reached the jury which has a reasonable potent-ial for tainting that jury, at which point, "due process requires that the trial court take steps to determine what the effect of such extraneous information actually was on that jury." Ewing, 914 F.3d at 1029.

When a trial court is apprised of the fact that an extrinsic influence may have tainted the trial, the proper remedy is a hearing "to afford the defendant an oppor-unity to establish actual bias." United States v. Davis, 177 F.3d 557 (6th Cir. 1999)  In considering whether a particular communication or contact between a juror and a third-party is more than innocous intervention, counsel should have been cog-nizant of the factors the Supreme Court deemed important in Remmer itself : any pri-vate communication; any private contact; any tampering, directly or indirectly with

25

with a juror during trial, about the matter before the jury. Remmer, 347 U.S. at 229. In addition, "conversations between jurors and jury attendants, however, stand on a different footing" ; "[N]umerous cases treat such communications as 'extraneous influences.'" Gereau, 523 F.2d at 153.

"Under clearly established Supreme Court case law, an influence on a jury's deliberative process is external if it is either "extraneous prejudicial information, i.e., information that was not admitted into evidence but nevertheless bears on a fact at issue in the case, or if it is an outside influence upon the partiality of the jury, such as private communication, contact, tampering ... with a juror." Robinson v. Polk, 438 F.3d 350,359 (4th Cir. 2006)

After being presented with the allegations described above, the district court and counsel failed to apply Remmer or any reasonable version of it; nor did counsel even request. Here it is without question that Juror 116's conversations with the J.A. was a contact or communication with a third-party; as was the administrator's private instructions to the whole panel. Chaney, therefore, turns his attention to whether this contact concerned a matter pending before the jury.

An unauthorized contact between a third-party and a juror pertains to the matter before the court, "when the alleged contact presents a likelihood of affecting the verdict," such as "when the allegation involv[es] claims of 'intentional improper contact or contacts that had an obvious potential for improperly influencing the jury." United States v. Frost, 125 F.3d 346,377 (6th Cir. 1997)(quoting, United States v. Rigsby, 45 F.3d 120,123–24 (6th Cir. 1995)) A "colorable claim" of an extraneous influence is a minimal standard. United States v. Cheek, 94 F.3d 136, 141 (4th Cir. 1996) All that is required is a threshold showing that "the extrajudicial communications or contact were more that innocous interventions." (Id.)

The district court did not carry out the inquiry required by Remmer; trial counsel did not raise a Remmer issue in the motion for a new trial; and appellate

counsel (different attorney) did not frame a Remmer issue for review in the opening brief. At no point in the trial or appellate courts was a modicum of Remmer discussed or even merely cited, Thus, it cannot be said that the Remmer issue was previously litigated. The legal inquiry which the district court applied in denying the motion for a new trial did not manifest the indicia of Remmer, e.g., the court required him to present evidence that a juror was actually biased and that Chaney was therefore actually prejudiced by the unauthorized communication. Put simply, the defendant was required to prove bias without any opportunity to do so, despite evidence of third-party intrusion into the jury function, and antithetical to Constitutional and Supreme Court presedent. This objectively unreasonable decision was not only infirm but pernicious.

An attorney's trial decisions must be based on proper exercise of judgement with an adequate knowledge of the facts and be correct on legal grounds. When the district court demanded proof of a Sixth Amendment violation — that is, proof of juror bias — before Chaney was entitled to relief, trial counsel remained mute. Counsel should have objected and pointed out to the court that such a requirement is directly at odds with Remmer. If the defendants were required to prove juror bias before obtaining a hearing, the Remmer hearing requirement, which is designed to determine "what actually transpired, or whether the incidents that may have occurred were harmful or harmless," Remmer, 347 U.S. at 229, would be utterly meaningless. "The post-conviction court's finding that there was no prejudice was especially unreasonable due to the fact that a presumption of prejudice applies in situations where ex-parte communications were made to the jury by a third-party." Moore v. Knight, 368 F.3d 936,942 (7th Cir. 2004) The Supreme Court decided Remmer in 1954, nearly sixty-five years ago, and is considered a landmark case in "jury misconduct" issues. There is no plausible reason why counsel was not versed in the law on "extraneous jury influences." "An attorney's ignorance of a point of law that is fundamnetal to his case combined with his failure to perform basic research on that

point is a quintessential example of unreasonable performance under Strickland." Hinton v. Alabama, 571 U.S. 263, 134 S.Ct. 1081, 1089 (2014)

The district court wrote that the most notable concern was "what the court knew and when the court knew it." Chaney, 211 F.Supp.3d at 975. To that end, the court said, a "court clerk" contacted the court "the fifth day of the Chaneys' trial" and "briefly relayed ... some information that she had received from the jury administrator about a recent conversation between the administrator and one of the trial's alternate jurors." (Id.) The information was sparse and nebulous. At that point in the timeline of events, the alternate juror "expressed 'some frustration with the process' and 'concerns about how serious[ly] the jury was taking their duty." (Id.at 975) The court explicitly stated that "[t]he clerk did not provide any" supporting details and "did not report any of these concerns to the court." (Id.)  In response, the court believed "that further investigation would be premature." (Id. at 976) Out of abundance of caution, however, the court instructed the jury that if it had "any issue ... related to the jury instructions," the jury should "bring those to [the court's] attention." (Id.)  Nevertheless, "the court never heard from the alternate or any other juror." (Id.)  Later, when the judge interviewed Juror 116, he learned the J.A.(Renee) told the alternate that she was NOT going to inform the court that Juror 116 had contacted her.(ECF 291 at 4)  There is NO confusion on this despite concerted attempts at denial. Then during deliberations, Juror 34, the initial jury foreperson, "made several attempts to talk to the judge but was put off each time. (Id.)  At this point, it is easily recognizable that a systemic problem of misconduct had permeated and infected the integrity of the jury, supporting the fact that even curative instructions do not cure all errors. "A jury cannot be trusted to follow instructions to disregard improper statements" ... United States v. Crutchfield, 26 F.3d 1089 (11th Cir. 1994)(citing, United States v. McClain, 823 F.2d 1457 (11th Cir. 1987)).

Following Juror 34's post-verdict affidavit, the court allowed only a very limited and cursory questionnare regarding his allegations of jury misconduct. Counsel was ineffective for failing to object, argue, and preserve the "essential elements" of ' his complaints' that are dispositive to the inquiry, and still remain cloaked ; specifically, "who" denied ("put off") him on several attempts, audience with the judge? Juror 34 was the initial foreperson and logically, only court personnel had the authority to deny his requests. This is resoundingly reminiscent of Juror 116 complaints'. It is well known that court personnel carry great weight with the jury, are seen as direct extensions of the court, and therefore, jurors may not consider them as an "external" influence on their duties. Furthermore, Parker, supra, "recognized the official character of the bailiff as an employee of the court" ... and "a jury committed to his care might easily conclude that a bailiff speaks for the judge."

Counsel was Constitutionally ineffective for failing to notice, object, and preserve these relevant and material facts in its motion for a new trial and forfeiting them for appellate review. These errors were inherently prejudicial and denied Chaney due process under the Fifth and Sixth Amendments, and the opportunity to prove bias in a Remmer hearing. Furthermore, these egregious errors could not possibly be construed as reasonable trial strategy by effective counsel.

The Sixth Circuit observed that "the district court acted recklessly by choosing to keep information about potential jury misconduct from defense counsel." Chaney, slip op. at 32. It is precisely because of this judicial interference and the government's and court's erroneous misapplication of F.R.E. 606(b), that Chaney argues that prejudice should be presumed. United States v. Cronic, 466 U.S. 648,658 (1984)  In this situation, prejudice is so likely to occur that a case-by-case inquiry is unnecessary. Strickland, 466 U.S. at 692.

The court compartmentalized this information until "the day after the close of trial." 211 F.Supp. 3d at 976.  Then, when the alternate juror contacted Chaney's

lawyer, "[c]ounsel reported this message to the court, and the parties promptly convened a telephonic conference." (Id.) "At the time, neither the court nor the parties knew if the alternate's allegations concerned potentially, 'extraneous' or 'outside' influences." (Id. at 977) This information gap prompted the court to conduct an in-camera interview with Juror 116. Although the court emerged from the interview noting there was NO external influence identified, therefore, further inquiry was prohibited expressly by F.R.E. 606(b), neither trial or appellate counsel objected to the court's flawed analysis. Since the court issued this opinion, counsel has remained mute.

Moreover, neither lawyer recognized that the court's conclusion that Juror 116's revelations did not reasonably draw into question the integrity of the verdict was similarily flawed. To begin with, trial counsel should have more thoroughly developed the factual record to show the exact dates' of the misconduct, the precise nature and extent of the misconduct, exactly what the misconduct entailed, the precise contours of the statements the jurors made, in order to determine what Juror 116 meant when she said the jurors were discussing "the case, his house, Dr. Chaney's house and everything", and perhaps most importantly, ascertain what unlawful ex-parte instructions the J.A. relayed to Juror 116, and then later, the panel. The J.A.'s unauthorized communications with the panel can not plausibly be construed as an innocous intervention involving merely ministerial, house-keeping issues, but rather obviously concerned matters before the court and jury, particularily matters put into evidence.

Nonetheless, counsel should have recognized that the details provided by the alternate – especially remarks about Chaney's house that suggest the jurors were focused on his lifestyle – had a clear potential for tainting the jury. The focus of the jurors lends to the inference that the jurors would act as a conscience for the community and taxpayers by convicting him. Any belief that Chaney was living ostentatiously in large part by fraudulently billing a publicly subsidized insurance program

set the tone for the jury's deliberations and is the kind of direct and rational connection between the extraneous contact and the adverse impact that calls the verdict into question. At a minimum, the comments Juror 116 made after the verdict were likely to inflame the passions of the jury and thus were of such character as to reasonably draw into the question of the integrity of the verdict. Furthermore, this is precisely the line of testimony the government used from the politically motivated and corrupt, cooperating witness Benny Ray Bailey, Jr., to cause the jury to start the premature deliberations regarding Chaney's assests early in trial, which ultimately led to unlawful ex-parte contact and communications between the jury and court personnel. Juror 116's empathetic declaration that "she was worried about a fair trial", apparently echoed by another female juror, should have caused pause, especially when a third-party, external source was positively identified.

Trial counsel violated Chaney's due process rights by failing to request a Remmer hearing to prove prejudice. See Lanier, 870 F.3d at 551 (noting the mere fact that a juror "instigated contact with a third-party to discuss the case would be enough to require the district court to hold a Remmer hearing") That failure, in turn, prevented him from "prov[ing] a Sixth Amendment violation of his underlying right to a fair trial and impartial jury, because to do that he must first demonstrate actual prejudice." Ewing, 914 F.3d at 1029 (getting the cart before the horse) As the Ewing court explained, "without a hearing, there is too much that is unknown about the deliberations to hold that [Chaney] has proven prejudice." (Id. at 1030) "When a petitioner shows that extraneous influence may have tainted the jury, due process requires the opportunity to show that the information did taint the jury to his detriment." (Id. at 1031)(original underscoring) "If ... the evidence heard is not reliable enough to support a finding of harmless error on its face, it certainly is not strong enough to meet the government's heavy burden necessary to overcome the presumption of prejudice." Moore v. Knight, 368 F.3d at 943.

In discussing the jury misconduct claim, the district court focused more on what was missing from Juror 116's allegations than what the alternate alleged. For example, on appeal, the Sixth Circuit correctly noted that "[i]t is unclear exactly what the alternate described to the administrator." Chaney, slip op. at 31. The appropiate response would have been to counter that the court ignored a critical component underlying the Supreme Court's concern in cases of juror bias – that without a hearing, Chaney was being deprived of the opportunity to uncover facts that could prove a Sixth Amendment violation. See Remmer, 347 U.S. at 229 ("we do not know from this record, nor does the petitioner know, what actually transpired, or whether the incidents that may have occured were harmful or harmless."); Remmer, 350 U.S. at 379–80 ("It was the paucity of information relating to the entire situation coupled with the presumption which attaches to the kind of facts alleged by petitioner which, in our view, made manifest the need for a full hearing.") Phillips, 455 U.S. at 215. ("This court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias.") Although previously mentioned, supra, it deserves reiteration where the court in Moore v. Knight, 368 F.3d at 943, "critized the the state court's factual findings as never actually address[ing] what the jury was told during the ex-parte communications – this half of the inquiry is a necessary component of any determination of prejudice." Furthermore, "the integrity of jury proceedings must not be jeopardized by unauthorized invasions." 347 U.S. at 229. Trial counsel performed desultorily by not discerning that the proper legal inquiry was under Remmer, and Remmer mandates that given Chaney raised a genuine concern of juror impartiality, due process required the court to remedy the allegation by ordering a hearing in which her client, Chaney, would have enjoyed a presumption of prejudice. See Phillips, 455 U.S. at 215. Trial counsel allowed the court to require him to first prove prejudice before affording him a hearing – which diametrically opposed Remmer. Given the complimentary failures of

trial counsel and the district court to investigate Chaney's extraneous influence claim, the court had no basis from which to determine Juror 116's <u>unlawful</u>, <u>ex-parte</u> communications with the J.A. on at least two occassions was not harmful.

Chaney must be given the opportunity to prove actual prejudice, The "attorneys' for each side should have the opportunity to question [Juror 116] and the rest of the panel to determine whether any external influence affected the jury's deliberations." <u>Lanier</u>, 870 F.3d at 550-51.  To prove prejudice, Chaney needs to call all of the jurors, including the alternates, the J.A., and the clerk. "[T]he evidentiary hearing will require exploration of the effects of extrinsic influence on the jurors, and the relevant weight they gave to proper and improper matters during deliberations." <u>Ewing</u>, 915 F.3d at 1035 (Moore, J., dissenting)  In <u>Ewing</u>, the Sixth Circuit ordered a <u>Remmer</u> hearing eight years later. (Id. at 1033)  The remand order was issued two and one-half years following the trial in <u>Remmer</u>.

The <u>Remmer</u> presumption is meant to protect against the potential Sixth Amendment harms of extraneous information from reaching the jury, but Chaney is not entitled to this presumption in attempting to prove that the jury was tainted by such information, because the presumption does not apply in the context of ineffective assistance of counsel,  See, e.g., <u>Gov't of V.I. v. Weatherwax</u>, 20 F.3d 572 (3rd Cir. 1994)

Trial counsel's failure to investigate and properly frame the <u>Remmer</u> inquiry fell well below an objective standard of reasonableness and deprived him of the <u>Remmer</u> presumption. If the district court had properly investigated the credible allegation of extraneous influence in a hearing, there is more than a reasonable probability that the Sixth Circuit would have found that the misconduct had a substantial and injurious effect or influence on the jury's verdict.  <u>Brecht v. Abrahamson</u>, 507 U.S. 619,637 (1993)

As for appellate counsel, on these facts, there is a reasonable probability that

the Sixth Circuit would have remanded for a hearing. In this circuit, assuming counsel would have been pressed into arguing plain error pursuant to F.R.C.P 52(a), counsel should have argued that even though Chaney's trial attorney did not request a hearing, the trial judge must conduct a hearing <u>sua</u> <u>sponte</u>. <u>See</u> <u>United States v. Davis</u>, 177 F.3d 552,557 (6th Cir, 1999);<u>;Bryan v. Bobby</u>, 114 F.Supp.3d 476 (6th Cir. 2015)  In fact, the Sixth Circuit routinely remands when a district court fails to conduct a <u>Remmer</u> hearing despite a colorable claim of extraneous influence.  <u>See</u> <u>United States v. Owens</u>, 426 F.3d 800,805 (6th Cir. 2005); <u>Harris</u>, 881 F.3d at 953 (citing <u>Owens</u> with approval)

Finally, appellate counsel should have argued that the district court's post-verdict interview with the alternate was not the functional equilavent of a <u>Remmer</u> hearing. The evidence shows that the jury, as a group, was potentially influenced by external information. In those circumstances, Circuit precedent requires individual-ized questioning of jurors to determine who had received that information and the extent of its influence. <u>United States v. Corrado</u>, 227 F.3d 528 (6th Cir. 2000); <u>see</u> also <u>Davis</u>, <u>supra</u>.; <u>United States v. Rigsby</u>, 45 F.3d 120,124 (6th Cir. 1996)(full blown hearing required where jurors as a group have extraneous contacts)  Chaney's appellate attorney was also Constitutionall ineffective.

Jury misconduct issues such those noted herein, have previously been decided in the Sixth Circuit. (§ 316 Law of the Circuit)  The recent case, <u>Lanier</u>, supra, as previously iterated, "the mere fact that a juror instigated contact with a third-party to discuss the case would be enough to require the district court to hold a <u>Remmer</u> hearing," is pertinent, substantial, and instructive. Appellate counsel was obviously aware of the dispositive issues in <u>Lanier</u>, and it's direct application to <u>Chaney</u>, since shortly after it's publication, sent petitioner a copy of the decision; several months before [her] direct brief was due. It is clearly evident that counsel was aware of the dispositive issues regarding erroneous application of Rule 606(b), which denied

defendant the right to an evidentiary hearing. Yet still counsel egregiously and un-
deniably "ignored" these "clearly stronger" arguments in favor of the "weak" one of
premature deliberations, following the lead of trial counsel.

Indeed counsel need not raise every nonfrivolous claim, "but rather select them
in order to maximize the likelihood of success on appeal." Smith v. Robbins, 528 U.S.
259,288 (2000)  "Only when ignored issues are clearly stronger than those presented
will the presumption of effective assistance be overcome." Dufresne v. Palmer, 876
F.3d 248,257 (6th Cir. 2017)  Likewise, in Chaney,, the dispositive factors upon
which the issues turn, and hardly rebuttable, is what would be considered reasonable
performance (strategy); merely continue the same "weak" and infirm argument as trial
counsel, citing "premature deliberations", almost exclusively relying on a largely
debunked, out of circuit case (Resko) that has not prevailed in the Sixth Circuit,
OR argue well-known and established Statutory, Supreme Court, Constitutional, and
Sixth Circuit case law precedent that is pertinent, substantial, and consistently
prevailed ?  The answer is glaringly apparent to even the layperson.

Likewise, separating wheat from chaff does not require an aquifer of complex,
cognitive decision-making skills or jurimetrics, nor does "winnowing-out" weaker ar-
guments in favor of those that are meritorious, substantial, and previously decided
by extensive Sixth Circuit precedent, particularly when the material facts "stare
in the face."  (Cf. Bobby v. Vanhook, infra)

Furthermore, when a "reasonable probability of prejudice" has been shown, where
substantial rights are to be affected, and the appropriate inquiry into the trier of
facts are prohibited by the missapplication of law and ineffective assistance of
counsel, harmlessness, can not be made to appear. (Cf. United States v. Rogers, 422
U.S. 35 (1975); and United States v. Harris, 9F.3d 493,499 (6th Cir. 1993))

35

GROUNDS FOR RELIEF

3.  Trial counsel was ineffective for forfeiting a motion to suppress all property seized during the search of Ace Clinique, Chaney's residence, and the airplane hangar on the basis that the search substantially exceeded the scope of the warrant and there was flagrant disregard for the terms of the warrant as to the property to be seized.

4.  Alternatively, appellate counsel forfeited this issue on appeal by not raising it as a claim for review following the district court's denial of the motion to reopen.

5.  Trial and appellate counsel was ineffective for failing to argue in district court and on appeal that blanket sup-pression of all evidence seized was warranted because the agents had exhibited flagrant disregard for the terms of the search warrant by conducting a wholesale seizure of Chaney's property amounting to a fishing expedition for the discovery of incriminating evidence.

6.  Trial and appellate counsel was ineffective for failing to argue, object, and preserve the issue that the FBI withheld relevant and materially exculpatory evidence from the mag-istrate judge in their application for the search warrants. Specifically, the material evidence of the KBML and KY Att-orney General's investigations that exonerate Chaney of the allegations of healthcare fraud and illegal distribution of controlled substances by way presigned prescriptions.

Chaney discusses these substantive claims together for the purpose of argument.

On September 9, 2013 the government sought and obtained a search warrant for the Ace Clinique, Chaney's residence, and their hangar. (R. 71-2, 71-3, 71-4) Each warrant expressly incorporated FBI agent Thad Lambdin's (Thad) affidavit. Importantly, Thad failed to produce exculpatory and relevant evidence in his possession to the magistrate judge issuing the warrants. Specifically, after lengthy investigations the KBML could only admonish Chaney for occassionally using presigned prescriptions prior to June 25, 2010, but finding no violation of the Kentucky Medical Practice Act or any other state laws, handed down NO disciplinary action. Likewise, after an extensive

audit by the Medicaid Fraud Unit (A.G.'s Office) initiated by Chris Johnson, Chaney's practice was referred to the criminal investigation unit of the Kentucky A.G.'s Office for prosecution. After an extensive review covering the period from Janurary 2007 through April 2013 (the same time period in the indictment), none of the allegations of healthcare fraud or illegal distribution of narcotics could be substantiated and the case was closed.  (Exhibits A & B)

Agent Thad willfully and with malice witheld this exculpatory evidence in order to obtain the search warrants, The due process clause of the Fourteenth Amendment places limits on the governments ability to bar evidence. Importantly, F.R.E 401 describes relevant evidence ... is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Trial and appellate counsel were Constitutionally ineffective for failing to notice, argue, object, and preserve, Thad's willfull attempt at abridging defendant's rights to exculpatory evidence to obtain the warrants' at any cost. It is a fact that Thad had a copy of the KBML and the KY A.G.'s exculpatory reports before he applied for the search warrants, on September 9, 2013 ; because on that same day he also obtained search warrants for cooperating witness Dr. Dusty Chaney, who was indicted in a separate criminal case. The search warrants for "Dusty" included a disciplinary report from the KBML, showing that they had already taken action on his medical license, relating to prescribing controlled substances. Obviously, since "Dusty's" file from the KBML was inculpatory of the charges he was facing, the KBML's report was used as evidence to help secure the search warrants; but since Chaney's file from the KBML, including an investigation into the very issue the FBI was concerned, namely presigned prescriptions, was completely exculpatory, Thad conveniently excluded it from his application. Perhaps more egregious, the completely exculpatory evidence produced by the KY A.G.'s Office

was not used in the FBI's application for the search warrants. Trial and appellate counsel rendered ineffective assistance - this information was never mentioned or considered as evidence by trial counsel and appellate counsel completely "ignored" the issue and remained mute, despite these very issues being brought to there attention. (more on this issue later)  It's unrebuttable that if the magistrate had been presented with this exculpatory evidence, there is a reasonable probability that the terms of the warrants would have been modified or not issued at all. Furthermore, it could have been preserved for appellate review. This was inherently prejudicial to Chaney's defense and obviously would have affected the outcome of the proceedings.

Trial counsel filed a motion to suppress the evidence in the searches. Counsel challenged the search warrants as insufficiently particular. (R. 71)  FBI supervising agent CHRIS Hubbuch seized 740 bixes of patient records and a filing cabinet filled with patient records. (Trial Transcript, R. 312, Page ID 3536)  Agents seized just short of 1,000 boxes of records, files, and manuals. (Id., Page ID 3544)  The district court referred the motion to the magistrate, who recommended suppression of evidence predating March 2006 and evidence seized from the airplane hangar. Otherwise, the magistrate recommended that the court deny the motion to suppress evidence seized from Ace Clinique and Chaney's residence. (R. 125)  The district court adopted the magistrates report nothwithstanding Chaney's objections. (R. 134,159)

At trial Thad testified. The defense questioned him about the search of Ace Clinique, and he stated that during the search the FBI took "not every file, but most of them", and that the FBI intended to take all of the patient files in the clinic. (R. 317, Trial Tr. 31, Page ID 38-39)  Defense counsel asked Thad whether he and the other agents tried to distinguish between files that were potential evidence and files that were not : Thad responded that the FBI took [files] from the different areas of of the clinic because [the agents] could not, on that day, determine what all was being used or not used." (Id., Trial Tr. 31-32, Page ID 3839-40)  Upon additional question-

ing, he confirmed that, at the time of the search, the FBI did not attempt to distinguish between files, but rather, "just took them all." (Id.)  This makes it abundantly clear, the search was executed with "flagrant disregard" for the terms of the warrant. Competent and "effective" counsel would have recognized this "clearly stronger issue" and litigated and preserved accordingly, as pointed out by the Sixth Circuit.

In light of the agent's trial testimony, the Chaney's renewed their motion to suppress. (R. 262, Page ID 2784)  They maintained that the search warrant was insufficently particular and that, assuming the constitutionality of the search warrant, "the agents" supposed 'deliberate and willful disregard' of the warrant's scope requires a blanket suppression of the patient files seized in the raid." (R. 273, Page ID 2905)

On appeal, the Sixth Circuit explained the parameters of it's holding :

> A final point deserves emphasis: the defendants do not challenge on appeal the execution of the warrant. Rather, they focus their arguments on the constitutionality of the warrant. Therefore, the manner in which the agents executed the search — namely, that they took all of the clinic's files, seemingly without review to see whether they constituted evidence of the named crimes — is of no moment. The defendants could have objected to the introduction of specific pieces of evidence as seized beyond the scope of the warrant, and, had the district court ruled against the defendants on those objections, we could have considered that on appeal. Those arguments, however were not made below.

Chaney, slip.op. at 18.  The court stressed that it "considered only the facial constitutionality of the warrants." (Id.)  In an almost unprecedent manner, the court pointed out that counsel was "ineffective" in their argument, by clearly and conscionably "ignoring and sacrificing" the obviously dispositive issues at hand, by continuing to make the same "weak" claims. It is indeed uncommon for the court to highlight such an error, stating, "a final point deserves emphasis", as if to warn future litigants how NOT to proceed in a Fourth Amendment claim when such material

evidence "stares you in the face." Furthermore, appellate counsel predictably, announced, "defendants continue to argue", the same "weak" and infirm argument of trial counsel, without any independent due diligence in reasearch or consideration of the dispositive facts at hand. "Reasonable strategy" does not include forfeiture and sacrifice of clearly dispositive issues that are pertinent, substantial, and incontrovertible. Counsel incomprehensively and plenarily failed to put the government's case to the crucible of adversarial testing.

"Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principle allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonably probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." Kimmelman v. Morrison, 477 U.S. 365,375 (1986)  Chaney argues that trial and appellate counsel were ineffective for failing to notice, object, and appeal the ground for suppression recognized by the Sixth Circuit as articulated above. Counsel merely accepted the trial courts opinion regarding "flagrant disregard".

In this circuit, the law is settled that "[a] flagrant disregard for the limitations of a search warrant might make an otherwise valid search an impermissible general search requiring the suppression of all evidence seized during the search." United States v. Lambert, 771 F.2d 83,93 (6th Cir. 1985)  See Also Marvin v. United States, 732 F.2d 660,674-75 (8th Cir. 1984); United States v. Wuagneux, 683 F.2d 1343 1353 (11th Cir. 1982)  "When law enforcement officers grossly exceed the scope of a search warrant in seizing property, the particularity requirement is undermined and a valid warrant is transformed into a general warrant thereby requiring suppression of all evidence seized under the warrant." United States v. Medlin, 842 F.2d 1194, 1199 (10th Cir. 1988)

In Medlin, the court cited Marvin, Wuagneux, and the Supreme Court's decision in Waller v. Georgia, 476 U.S. (1984), "as authority for the proposition that even

evidence which is properly seized pursuant to a warrant must be suppressed if the officers executing the warrant exhibit 'flagrant disregard' for its terms." 842 F.2d at 1198-99.  In Medlin, the Tenth Circuit was alarmed "[b]ecause of the large number of seized items not listed in the warrant, "which made it ... possible the police used this warrant as a pretext for a general search," and "which would taint the whole search." 798 F,2d at 411.

The actions of the agents in the search of Chaney's home and the premises of Ace Clinique are similarly disturbing for the reasons the Sixth Circuit noted – "the manner in which the agents executed the search" was "that they took all the clinic's files, seemingly without review to see whether they constituted evidence of the named crimes." Slip op. at 18.

Agent Thad, admitted that the FBI intended to seize all the clinic's files, did not differentiate the patient files that were potential evidence and those that were not, and instead, "just took them all." (R. 317, Page ID 3839-40)  Importantly, it's abundantly clear from the testimony of Thad that there was a wholesale seizure of the property amounting to a fishing expedition for the discovery of incriminating evidence, akin to attempting to clean their fish before they were caught.

Despite that the execution of the warrant was constitutionally defective, and from the prespective of trial and appellate counsel, it is hard to imagine a more pronounced case of a search warrant execution conducted in such flagrant disregard for it's terms, egregiously, this issue was forfeited. No effort was made to establish a connection between seizure of the majority of the seized items and the terms of the warrant. That the agents did not adhere to the specific terms of the warrant and that this was standard procedure in the execution of a federal search warrant of this type is shown by Agent Hubbuch's acknowledgement that as a result, the FBI was obliged to return more tha 800 files the month following their seizure. (R. 312. Page ID 3546-47) See, e.g., United States v. Foster, 100 F.3d 846,852 (10th Cir. 1992) (characterizing

a similar procedure as "particularly disturbing" and requiring blanket suppression)

In Marron v. United States, the Supreme Court stated :

> The requirement that warrants shall particularly describe
> the things to be seized makes general searches under them
> impossible and prevents the seizure of one thing under a
> a warrant describing another. As to what is to be taken,
> nothing is left to the discretion of the officer executing
> the warrant.

275 U.S. 192,196 (1927).  The FBI agents employes the federal search warrant as a fishing expedition.

Finally, the agents did not act with objective reasonableness in conducting the search. This exception is available in those cases in which the officers act object-ively reasonable in executing a search warrant which is subsequently found to be in-valid.  In United States v. Leon, 468 U.S. 897 (1984), the court said the exception "assumes, of course, that the officers properly executed the warrant and searched only those places and for those objects that it reasonably believed were covered by' the warrant." 468 U.S. at 918 n.19  The basis for the claim underlying counsel's ineffectiveness does not contain an issue relating to the validity of the warrant itself, but the manner in which both trial and appellate counsel handled this Fourth Amendment claim was objectively unreasonable.

"Prejudice flowing from an attorney's failure to file a suppression motion is determined by examining the likely success of the motion." Kellog v. Scurr, 741 F.2d 1099,1104 (8th Cir. 1984)  The record evidence discussed above, and reflected in the Sixth Circuit's decision on direct appeal, proves beyond cavil that the FBI agents executed the search warrant with a flagrant disregard for its terms and acted pur-suant to what was the agents' standard procedure in executing this warrant. Both trial and appellate counsel mishandled the motion to suppress that was filed in this case, both the original motion and the motion to reopen. See e.g., United States v. Owens, 387 F.3d 607 (7th Cir. 2004) (counsel's inadequate presentation of motion to

suppress evidence obtained from defendant's home was ineffective assistance)

Given that "blanket suppression is the sole remedy for a flagrant disregard in executing the terms of the search warrant, there is no doubt that Chaney has established that if counsel had properly litigated this ground for suppression of evidence, there is more than reasonable probability that the result of the proceedings would have been different. Cf. Norris v. Lester, 545 F.App'x 320 (6th Cir. 2013) (defense counsel was ineffective for failing to show, bothduring the motion for a new trial and on direct appeal, defendant's confession should have been suppressed)

Again, as appellate counsel confesses, "now when a party is arguing about how to word a warrant to seize files", they will refer to your case. Put simply, this case will teach law enforcement how to properly word a search warrant for medical files to avoid litigation by compentent counsel, and defense litigants will know how NOT to pursue a meritorious Fouth Amendment claim. Counsel was constitutionally ineffective.

7.   Trial counsel was ineffective for failing to consult and hire the qualified experts that sentencing counsel retained for Lesa Chaney's sentencing hearing, Dr. Stromberg and Dr. Russell, for the purpose of establishing the range of legit-imate medical purposes that might be pursued in treating the pain of patients and to show that Chaney's prescriptions fell within the usual course of professional practice in pursuing treatment of his patients.

8.   Trial counsel's failure to investigate the government's expert witnesses prior to trial was inexcusable and ineffective be-cause their opinions were crucial to the defense.

Following the jury's verdict, trial counsel, Elizabeth Hughes, was replaced with attorney Christy Love. Attorney Love represented Chaney and Ace Clinique at sentencing and on appeal. Lesa Chaney continued to be represented by Robert Abel.

Chaney discusses these substantive claims together for the purposes of argument.

43

In preparation for the sentencing hearing, Attorney Love and Attorney Abel collaborated and agreed that Chaney and Lesa Chaney needed to secure expert testimony to testify to the legitimacy of Chaney's medical practice, that he dispensed the drugs in good faith in the course of medically treating his patients, and accordingly dispensed them for a legitimate medical purpose in the usual course of accepted medical practice. Egregiously, no experts were interviewed, consulted, or called to testify on behalf of the defendants' regarding any of the charged counts in the indictment.

Trial counsel failed to conduct any investigation in order to make a reasonably objective, informed decision as to what strategy to pursue. It was clear, early in discovery that the govenrment would produce at least two "expert witnesses", who would testify regarding specific patient files on specific dates of service.

The record shows that trial counsel should have settled on the defense that Chaney acted in "good faith"." "'Good faith' in this context means good intentions and an honest exercise of professional judgement as to a patient's medical needs. It means that the defendant acted in accordance with what he reasonably believed to be proper medical practice." United States v. Volkman, 736 F.3d 1013,1021 (6th Cir. 2013) See also, R.272: Jury Instructions, Page ID 2837 & 2846 (defining "good faith") Trial counsel's decision not to engage and hire an expert is owed no deference, because counsel did not make a sufficient investigation prior to making the decision that such expert assistance would not assist Chaney's testimony and defense. See, Wiggins v. Smith, 539 U.S. 510,525 (2003) ("[A] lawyer who fails adequately to investigate and introduce evidence that demonstrates his client's factual innocence, or that raises sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance.")

> Counsel is obligated to conduct a reasonable investigation in order to present the most persuasive case that he can. Counsel must conduct a pretrial investigation into the availability of independent, objective sources to support the part of his client's testimony that he knows or can reason-

44

ably expect will be challenged, and subsequently to present to the jury any evidence that he finds that tends to show his client's innocence, tends to undermine the prosecution's case, and raises a reasonable doubt as to his client's guilt, unless he makes an informed strategic decision that the risks of introducing such evidence outweigh its benefit to the defense.

Richter v. Hickman, 578 F.3d 944,956-57 (9th Cir. 2009)

As a proffer concerning the testimony the witnesses would have offered if they had been investigated and called by trial counsel, Chaney turns to their testimony at Lesa Chaney's sentencing hearing. See testimony of Dr. Arnold Stromberg, Ph.D. (R. 460, Page ID 9274-91) and Dr. Larry Russell, M.D.,CMD (R. 460, Page ID 9609-50)

Dr. Stromberg testified that he was a twenty-six year employee of the University of Kentucky as the Department Chair for the Department of Statistics.  Lesa Chaney's attorney hired Dr. Stromberg to "determine a sampling method and a sample by which the proportion of fraudlent cases could be identidied." He determined that about 74,000 prescriptions existed, and his task was to determine what would be a statistically reliable numerical sample. (Id., Page ID 9577-78)  Dr. Stromberg's objective was to provide a "statistically reliable numerical sample" by estimating the true proportion of fraudlent claims for prescriptions by randomly selecting files. (Id.) Dr. Stromberg selected 100 prescriptions and stated that "by selecting 100, we have a compromise in getting a reasonably accurate estimate without a ridiculous amount of effort;" he testified that "from a statistical point of view," it was unnecessary "to review all the claims." (Id. Page ID 9579-80)  He also testified that the lesser amount of "files that were reviewed still represented a random sample from the population of claims," and the fact that Dr. Russell was unable to review all 100 files for prescriptions, or the 100 files for claims, did not impact the statistical reliability of the sample. (Id., Page ID 9581)

Dr. Stromberg stated that he had the opportunity to review the reports produced by Dr. Russell. With regards to Dr. Russell's findings, Dr. Stromberg testified that

....... "NONE OF THE CLAIMS REVIEWED WERE FOUND TO BE FRAUDULENT, AND SO THAT MAKES THE ESTIMATE ... ZERO" : he stated that although " we know that the jury found fraudulent claims, we didn't find any evidence of fraudulent claims." (Id., Page ID 9582-83)

Dr. Russell testified that he is Board-certified in Family Medicine and has practiced for nearly 30 years in Kentucky and North Carolina. (Id., Page ID 9612)  Dr. Russell's medical practice included patients suffering from a variety of chronic medical issues, including chronic pain. He acknowledged that he was hired as an "expert" to review a randominized sample of patient files specific to dates of care and asked to opine honestly whether the treatment reflected within those files was within the ordinary practice of medicine. (Id., Page ID 9615)

Dr. Russell performed two types of review; a pharmacy review and a procedural review. He was asked to review patient charts as to the written prescriptions, with the other review targeting the medical services and procedures Chaney rendered to his patients for the purpose of determining if they were medically necessary and accomplished in good faith. At the beginning, Dr. Russell was asked to review 100 patient charts for each review, but not all of the files were available. (Id., Page ID 9615-16);  the government had not returned all seized files. Turning to the procedural review, Dr. Russell reviewed 87 patient files and 78 patient files for the pharamacy review. (Id., Page ID 9621)

Specifically, Dr. Russell testified that Chaney transitioned some patients from the narcotic drugs hydrocodone and oxycodone to the anti-narcotic drug Suboxone and, in fact, removed a patient from the treatment regime because he was not regularly attending Narcotics Anonymous. Dr. Russell characterized Chaney's decision to include pain management specialist Dr. Wright as "good medical care." (Id., Page ID 9626-27)  The referrals supported his opinion. Out of the 78 charts he reviewed, Dr. Russell testified that Chaney

46

referred 56-57 of those patients to Dr. Wright who augmented the frequency or increased the pain medication that Dr. Chaney had initially prescribed. (Id., Page ID 9627-28); (see also : Exhibit C, which counsel failed to introduce into evidence)

Dr. Russell detailed his findings in a report titled "Chaney Pharmacy Review." He contradicted the testimony of Dr. Stephen Loyd, a physician in Internal Medicine and the government's primary medical expert, by finding that all of the medical charts he reviewed contained pain contracts signed by the patient and all but one possessed a questionnare about the patients pain and prior history. (Id.)  "Common sense says that Dr. Wright's confirmation of the current plan and, not infrequently, increase in the amount of the narcotic given add legitimacy to the use of medications in those part-icular patients." (Id.)  Save "for a few of the charts, the overall amount of narcotic was certainly well under the current [2017] recommendation of no more than 100 mg of morphine equilavent daily." (Id.)  Prior to 2014 (the time period of the indictment), there were NO published guidelines. According to Dr. Russell, in EVERY chart he re-viewed, "the narcotics were prescribed for a legitimate medical purpose and within the usual course of professional practice" and Ace Clinique's use of narcotics was "medical-ly necessary and appropriate. (Id.) Dr. Russell's testimony proficiently and decisively rebuked the government's medical expert, Dr. Loyd. Unfortunantly, due to ineffective and unreasonable assistance of counsel, the jury was unable to hear this testimony, giving them anything else to consider besides the government's version of the events.

"A violation of the Controlled Substance Act occurs when a physician dispenses or distributs a controlled substance in a manner that is not authorized by law – i.e., the prescription is issued by a physician without 'a legitimate medical purpose by an indi-vidual practioner acting in the usual course of his professional practice.'" Volkman, 736 F.3d at 1026 (citing inter alia, 21 U.S.C. §841(a)(1); 21 C.F.R. §1306.04(a)) In order to obtain a conviction under 21 U.S.C. §841(a)(1) against a physician, the government must show: (1) that defendant distributed a controlled substance; (2) that

he acted intentionally or knowingly; and (3) that defendant prescribed the drug without a legitimate medical purpose AND outside the usual course of professional practice."   United States v. Johnson, 71 F.3d 539,542 (6th Cir. 1995)

Trial counsel did not meet her basic obligation to her client. Dr. Stromberg's and Dr. Russell's "expert medical testimony" was required for Chaney's jury to ascertain and appreciate what type of conduct is and what type of conduct is not within the usual course of medical practice, and what type of conduct is without any legitimate medical purpose. Although it was apparent that an issue critical to the outcome – whether Chaney dispensed the drugs in good faith in the course of medically treating a patient – could best be resolved through the presentation of "expert" medical evidence (instead of "character witnesses"), trial counsel failed to consult with a medical expert of any kind and thus failed miserly, to conduct the rudimentary investigation necessary in order to (1) decide upon the nature of the defense to be presented, (2) determine before trial what evidence she should offer, (3) prepare in advance how to counter damaging medical expert testimony that counsel knew the government would introduce, and (4) effectively cross-examine and rebut the government's expert witnesses once they testified during the course of the trial. Counsel had no strategic reason for failing to do so, as sentencing counsel's procurement of Dr. Stromberg's and Dr. Russell's expert testimony attests. Their testimony not only rebuked Dr. Loyd's opinions but was sufficient to significantly mitigate the defendant's sentencing. See Strickland, 466 U.S. at 690-91 ("[S]trategic choices made after less than complete investigations are reasonable precisely to the extent that reasonable professional judgements support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.")  It was important for Chaney to present this expert testimony to show that the "pattern" or "red flag" evidence that the government sifted from a large number of files did not undermine "good faith".  In preparing their expert testimony and

how best to counter the damaging expert testimony from the government's expert witnesses', counsel could have proven that the government's evidence, that was derived from summaries of large numbers of Chaney's patients' files, lacked strong probative force as to improper medical practice, because it was directed only in a general way to the quantity of prescriptions written and quantity of patients scheduled.

Expert testimony was <u>critical</u> to the success of the defense. A central dispute between the government and the defense was whether Chaney's interactions and treatment of his patients was done in good faith. The concept of "good faith" is vague and amorphous. So is the type of conduct that falls within what must necessarily constitute ordinary, legitimate practice and purposes. Trial counsel settled on Chaney as her "expert". But this decision was not objectively reasonable. As the defemdant on trial, his testimony lacked the hallmarks of an expert normally qualified pursuant to Fed.R. Evid. 702, in particular, neutrality, objectivity, and disinterest.

"<u>Character witnesses</u>", testify subjectively "about another person's character traits or community reputation, whereas, "<u>Expert witnesses</u>" testify objectively, "qualified by knowledge, skill, experience, education, or training to provide a scientific, technical, or other specialized opinion about the evidence or a fact issue. (<u>Black's Law Dictionary</u>, 3rd Pocket Edition, 2006)

The record is clear, the "four colleagues" who testified for the defense were "character witnesses", who did not review or opine regarding any specific patients medical file or dates of service included in the government's indictment, but rather spoke only in general terms about their observations of patient care; and certainly did not give an opinion about the government's experts' findings.

Trial counsel relied exclusively and errantly on the defendant himself (not qualified as an expert), to provide the only testimony concerning specific patient encounters on specific dates of service, whereas the government witnesses' opined for hours. Given the complex nature of the case, defendant's suffered irreparable harm and pre-

judge from counsel's failure to call "experts" to testify who could bolster and give an independent qualified opinion that comported with Chaney's version of the events, instead the fact-finder was met with minimal resistance; the panel had no other facts in evidence to even consider except that which was introduced by the government. This decision was not objectively reasonable, but rather, negligent and detrimental.

Fundamental to the argument is counsel's complete reliance on the defendant's version of the events, where no factual evidence from an independent qualified expert was introduced concerning the legitimacy of Chaney's prescriptions. Therefore, the fact-finder , met with minimal resistance, could not plausibly have any other evidence to consider except that produced by the government's experts'. This decision (neglect) was illogical and objectively unreasonable. Without question, the testimony of Dr. Stromberg and Dr. Russell effectively and convincingly rebuked the government's contentions and experts' opinions (and necessairly, the elements of the crime), that Chaney had no legitimate medical purpose for his prescriptions and acted outside the usual course of proffessional medical practice. As the court has noted, presigned prescriptions, per se, is NOT illegal and certainly NOT an element of the crime, or included in the jury instructions.  (DOC 371, Page ID 5914); [R. 272]

Cf. Wiggins v. Smith, 539 U.S. 570 (2003)(finding counsel's performance in not investigating and presenting available mitigating evidence violated defendant's right to effective assistance of counsel.) It is scarcely rebuttable and beyond reproach, Dr. Stromberg and Dr. Russell were available, and had they testified at trial, the facts in evidence produced by the government and the trier of fact would have been met much resistance, giving the panel independent, exculpatory, factual material evidence that undoubtly would have affected the outcome of the trial. Counsel, negligently failed to give the panel anything else to consider except the defendant's version of the events. This was inherently prejudicial. Cf. United States v. Arny, 137 F.Supp. 3d 981 (6th Cir. 2015) (where the court noted, Dr. S. could have justified Dr. Arny's

prescriptions, even though counsel nor the court knew what her testimony might entail, it was objectively unreasonable to decide not to at least interview her and determine if her testimony might prove beneficial to the defense.)   In contrast, Chaney knows precisely what the testimony of experts' Drs. Stromberg and Russell would have been at trial, and it is abundantly clear from the record, they decisively and proficiently rebuked the government's experts. The objective and contradictory facts now in evidence, produced at the sentencing hearing, forecloses on any reasonable doubt, that [their] testimony would have affected the outcome of the proceedings; as it obviously did in mitigating defendants' life sentences.

Even if counsel argues that the government's case was "weak", it is of no moment and owed no deference, because [it] was aware that the government would produce damaging testimony from two experts who had reviewed specific medical files, on specific dates of care, and still yet failed to make any objectively reasonable decision (strategy) to challenge and rebut their evidence; except solely rely on the defendant himself, who could not be qualified as an expert or possibly be considered reasonably objective by the trier of fact.

Without any reasonably objective investigation to determine if the defendant's version of the events could be collaborated and substantiated by independent experts, who could review the specific files the government used as evidence, the failure to at least interview an expert was negligent and unjustifiable. Put simply, the "strategic" decision not to investigate, interview, much less determine if experts existed, that could bolster the theory of the defense was objectively unreasonable. Moreover, "[a] purportedly strategic decision is not objectively reasonable when the attorney failed to investigate his options and made a reasonable choice between them." Towns v. Smith, 395 F.3d 251,258 (6th Cir. 2005)

As in the case at bar, "the record contains no evidence that the decision not to investigate or interview expert witnesses was strategic, rather it stems from neglect."

see e.g., United States v. Six, 600 F.App'x 346,357 (6th Cir. 2015)("It is not the court's duty to second-guess [counsel's] strategic decision but, instead to decide whether they were in fact strategic decions and not neglect.")  Without any evidence of an objectively reasonable strategy, the "neglect" in failing to investigate even the availability of experts is undeniably unjustified. This failure to subject the government's case (experts') to the crucible of adversarial testing was inherently prejudicial and violated defendant's Sixth Amendment right to effective assistance of counsel.

Trial counsel's failure to consult any medical experts constituted a threefold abrogation of her duty under Strickland.  Her first failure lay in her inadequate investigation prior to settling on a trial strategy; her second, in failing to conduct the necessary investigation before trial to determine whether medical evidence might be available to introduce or how expert testimony might fit with the theory she had chosen; and third, in failing to consult experts who could assist during trial when the government introduced damaging expert testimony regarding Ace Clinique's medical practices.  In doing so, counsel not only neglected the opportunity to discover the availability of objective evidence corroborating Chaney's testimony, but also rendered the defense vulnerable to impeaching expert testimony that she was not prepared to rebut. The unreasonableness of not investigating the availability of corroborating expert evidence is at its zenith when the "expert" is the defendant himself. It has been held that "a lawyer who fails adequately to investigate and introduce evidence that demonstrates his client's factual innocence, or that raises sufficient doubt to that question to undermine confidence in the verdict, renders deficient performance." Duncan v. Ornoski, 528 F.3d 1222,1234 (9th Cir. 2008)  The touchstone of the inquiry is reasonableness of counsel's conduct. The failure here to consult even a single medical expert regarding critical issues (elements of the crime) in the case was unreasonable and constitutes deficient performance.

Trial counsel's failures were prejudicial: available medical expert witnesses would have controverted the government's explanation that Chaney prescribed drugs without a legitimate medical purpose and outside the usual course of professional practice. Because the jury was required to reach an unamious verdict on each count, the outcome could have differed if even "one juror would have struck a different outcome." Wiggins, 539 U.S. at 537.  The court should contrast the evidence that was actually presented to the jury with that which could have been presented had counsel perform-ed efficiently, and then ask whether that omitted evidence might have created a reas-onable doubt in the mind of at least one juror.  Richter, 578 F.3d at 956-57.  The answer appears clear.  Counsel's pretrial failure to consult medical experts who could have interpreted the treatment and billing practices had direct, and damaging, consequences. Counsel developed a strategy for trial to treat the case primarily as a credibility contest, to call only the defendant, Chaney, as an "expert" witness regard-ing these central issues. She was not equipped to respond to the government's medical witnesses. These negative consequences, in turn, were exacerbated by counsel's fail-ure during trial to put forward reasonable efforts to compensate for her inadequate pretrial investigation; even at this point, however, she did not consult a single medical expert who could advise in the vein of Drs. Stromberg and Russell - that expert medical testimony existed that she might present or that might be used to successfully cross-examine the government's experts or counter their testimony. Significantly, as a result, counsel failed to introduce any expert testimony, testimony that would have raised reasonable doubts in the minds of the jurors.

In addition, Aspen Taylor testified on behalf of the government concerning Medicaid Fraud. She is employed by the Kentucky Office of the Attorney General in the Medicaid Fraud Unit. Trial and appellate counsel unreasonably failed to notice, argue, object, and litigate the fact that she was unable to testify as to the medical necessity of any of the medical services rendered by Chaney or Ace Clinique. (R. 459, Transcript

Page ID 9498-9514)   At the sentencing hearing, Drs. Stromberg and Russell, after performing a randomized survey of Chaney's practice concluded that ALL of the records reviewed were indeed medically reasonable and necessary. More importantly, Taylor's testimony was diametrically opposed to the findings of the criminal investigators in her own agency - the Medicaid Fraud Unit of the Kentucky Attorney General's Office. These investigators determined that none of the allegations of healthcare fraud could be substaintiated.   (Exhibit A)   Their report was made available to both trial and appellate counsel. Counsel was grossly and unreasonably ineffective for failing to present, argue, and litigate this exculpatory and uncontroverted material evidence at trial, or subponea the investigators to testify regarding their findings. Likewise, appellate counsel was ineffective for failing to litigate this issue on direct appeal. There was no attempt to investigate or introduce this material evidence that would have undermined confidence in the verdict, thus rendering ineffective assistance. (see e.g., Wiggins, supra and Richter, supra)

Counsel made no effort to prove that criminal liability cannot devolve to whether Chaney pursued the best or more prudent course of treatment. Both Drs. Stromberg and Russell stated that when Chaney prescribed controlled substances for patients who informed him that they were suffering from serious physical pain, he was acting with a legitimate medical purpose within the usual course of professional practice.   There is a reasonable probabiity that at least one juror, upon hearing the evidence from these expert witnesses, would have concluded that the government had failed to carry its burden of proof regarding Chaney's guilt, and declined to vote to convict him. Strickland requires the court to assess the aggregate of counsel's deficient actions when evaluating whether such failures are prejudicial.   466 U.S. at 695-96.   The existence of factual inconsistencies in a case such as this does not absolve counsel of the responsibility to investigate, nor does it eliminate the likelihood of prejudice when she fails to do so. Instead, introducing expert medical testimony that confirms

Chaney's version of the events or casts doubt on the government's, is even more critical in such circumstances, and even more likely to establish reasonable doubt in the minds of the jurors.  See Wiggins, supra, (finding counsel's performance in not investigating and presenting mitigating evidence violated defendant's right to effective assistance of counsel.)

Finally, it proves beyond pale, and eviserates clearly established Federal Law, for the government to contend that defendant's, in a complex criminal proceeding are not entitled to their own "expert" witnesses, who can decisively and proficiently controvert the government's evidence, by adversarial testing.

The minimum showing for Strickland's prejudice requirement is "even less than a fifty-fifty chance." Hernandez v. Chappell, 878 F.3d 843,846 (9th Cir. 2017) The "expert" testimony of Dr.'s Stromberg and Russell would have swung the case to Chaney and given the jury reason to acquit him.

9.   Trial and appellate counsel were ineffective for failing to argue, present, and preserve material and relevant evidence that a cooperating witness presented and introduced the KY Attorney General to Chaney's office for the purpose of extorting financial contributions while Chaney and Ace Clinique were under investigation by state prosecutors.

10.   Trial and appellate counsel's failure to argue, present, and preserve relevant and material evidence of political coercion by a cooperating witness and state official that would have challenged, impeached, or suppressed testimony of cooperating witnesses and investigators. This was inherently prejudicial and prevented the defendant from producing exculpatory evidence and exposing unethical investigative and prosecutorial misconduct in the jury's hearing.

Chaney discusses these substantive claims together for purpose of argument.

Central to these claims is the precisely articulated findings in <u>Towns v. Smith</u>, 395 F.3d 251,258 (6th Cir. 2005), where the court found that trial counsel's failure to conduct a reasonable investigation into a "known and potentially important witness violated the petitioner's Sixth Amendment right to effective assistance of counsel." Furthermore, it is objectively unreasonable to "decline to interview a 'known and important witness' without first undertaking a <u>full</u> investigation into whether [the witness] could assist in the [defendant's] defense." Specifically, in the case at bar, included the Perry County Attorney, Chaney's local attorney, Senator Benny Ray Bailey, Sr., the Kentucky Attorney General, and others' who had direct knowledge of the events.

On or about June 6, 2013, cooperating witness Benny Ray Bailey, Jr. (BRB,Jr.) met with FBI Agent Thad Lambdin in Hindman, Ky. to proffer in an unrelated "pill-mill" case in which he and cooperating witness, Dr. Dusty Chaney (Dusty) were indicted. The narrative quickly turned to <u>Chaney</u>. In a sworn statement, BRB,Jr. stated that he witnessed Chaney (and others) give Jack Conway (Attorney General of KY), candidate for U.S. Senate, twenty-thousand dollars. (see <u>BRB,Jr.'s 302 FORM</u>) [H]e failed to mention however, that [he] introduced Chaney to Conway at Chaney's medical office during business hours (with staff present) and that he was also a candidate for KY House of Representatives for Perry County. More importantly, at the time of this meeting, Chaney was aware that he was under investigation by state prosecutors. During this meeting, BRB,Jr. stated, "this is Jack Conway your Attorney General and next U.S. Senator, he can make you or break you," and "dad (Senator BRB,Sr.) sent us to get some money and get you to have a fund-raiser."

Monday, September 9, 2013, the FBI conducted the raid on Chaney's residence, office, and hangar. From the beginning and throughout the day, FBI Agent's Lambdin, Hubbuch, and Mounce, and state policeman Randy Hunter repeatedly threatened the Chaney's to tell them "everything you know about political corruption in KY." "We just came from your house and know that you have information that would go a long way

on your charges." Chaney's local attorney was present at this time and periodically throughout the day and memorialized many of the events. Three days later, Chaney's initial hired attorney called to say, you need to come to Lexington and tell the U.S. Attorney everything you know about political corruption, without even inquiring what Chaney was being charged with.  These documents as well as others were given to trial and appellate counsel.

Chaney repeatedly requested trial counsel to subpoena Senator BRB,Sr., the Perry County Commonwealth Attorney, the Attorney General, and others as witnesses, but was told that the U.S. Attorney and the court would not allow [them] to be witnesses' in this trial, and that they were already aware of the situation. Appellate counsel was also implored to bring these issues on direct appeal, but obviously declined. Counsel refused to raise these issues despite Chaney being able to produce other witnesses' to confirm certain facts.  This was inherently prejudicial to the defendant. The Supreme Court in Strickland pronounced, counsel's decision not to investigate is more likely to be unreasonable if the defendant told them to interview a witness and gave a reasonable explanation for the request.  Strickland at 691.

It was with an abundance of animus and vitriol that investigator Chris Johnson (Johnson) of the "Office of the Inspector General" (KY A.G.'s Office) initiated the probe into Chaney's practice at the complicit instruction of Senator BRB,Sr., the father of cooperating witness BRB,Jr. This fact remains uncontested. Despite repeated protestation by the defendant to his counsel to object, argue, and preserve this materially relevant evidence, it was nonetheless successfully barred from Johnson's and BRB,Jr.'s testimony by the prosecution without any challenge.

The material facts at issue began in a meeting on or about August 2010, at the Perry County Commonwealth Attorney's Office ; Johnson's first attempt to secure an indictment. At this meeting, Johnson made the statement, "the Senator (BRB,Sr.) didn't send me down here to investigate anyone but (Ace) Chaney." This statement among others

was also memorialized in a letter by Chaney's local attorney and was given to both trial and appellate counsel. Chaney's local attorney also filed a complaint with Johnson's supervisor at the O.I.G. in Frankfort, Ky. Throughout the course of trial or appeals, [h]e never received as much as a phone call from either counsel, regarding these issues. When Johnson was cross-examined at trial, he was asked, "who sent you to investigate Ace", and as he began to speak, the prosecutor vehemently objected and moved the court to strike the question, stating, "you can't say that name in court", referring to BRB, Sr. Without colloquy at bar or otherwise, or argument from counsel, the court sustained the motion. It was abundantly clear at that point, that the court was keenly aware of the serious inflammatory nature of the event and ramifications of a mistrial due to political corruption, prejudicial and malicious investigation and prosecution involved in the case; notwithstanding the tremendous effort required to keep the issue cloaked.

The U.S. Attorney had the 302 statement from BRB,Jr. months before the FBI secured the search warrants. They were keenly aware of the allegations of coercive political activity and nevertheless allowed BRB,Jr. to testify at trial as a key witness, without any objection from counsel. His testimony was used to set the tone for a 25-day trial, ultimately leading the jury to premature deliberations regarding Chaney's assests and more importantly, underlined unlawful, ex-parte contact and communication between the jury and court personnel (external influence).  The prosecution obtained his 302 statement from the FBI on or about June 7, 2013 but only disclosed the unredacted version in Janurary 2016, just weeks before trial. Obviously, they felt it was very important information to keep from the defense for two and one half years. However, in approximately December of 2015, Chaney received anonymously, an unredacted version. Chaney promptly met with counsel regarding this information. Counsel replied to the effect, what do you want me to do with this ? There's no way the government or the court will allow this to be introduced at trial.

The FBI, U.S. Attorney, and Chaney's counsel all had knowledge that one of the

prosecution's key witnesses had made serious allegations of coercive political act-
ivity, yet the trial maliciously proceeded without objection or challenge. It is now
abundantly clear that counsel had no intention of investigating BRB,Jr.'s allegations,
much less attempting to suppress his testimony, since it would have necessairly called
Conway into focus and required his subpoena to court. To date, there has been no in-
vestigation into these allegations; Chaney certainly has never been questioned to any
facts, (except by investigative reporters'), nor has any other credible witnesses which
have been identified. Chaney's trial counsel, fully understanding that this information
was materially relevant to challenge, impeach, or suppress the testimony and motives
of the investigators' and BRB,Jr. nonetheless, allowed the government to proceed un-
challenged. This was inherently prejudicial to the defense and prima ficae evidence
of ineffective assistance. If this information had been exposed at trial, in the jury's
hearing, it would have been cause for the court to declare a mistrial, or at a minimum,
the jury to acquit the defendants'. The prosecutor and defense counsel violated ethical
and statutory obligations.  See  ABA Standards For Criminal Justice and Prosecution
and Defense Function, 3-3.11(a)(3rd ed. 1993); 3.8(d) 2008. It is disingenious to use
the prestige of the government to vouch for, anoint, and justify a cooperating witness
who brought to the governments attention, an inferno of political coercion, implicating
himself, then douse the flames in secrecy.

   Furthermore, Chaney's appellate counsel, being fully apprised of these issues at
their first meeting, and her hiring conditioned on litigating same, amongst other issues,
failed to notice and litigate on direct appeal, further causing prejudice to Chaney,
further cloaking the facts. If these issues were litigated appropriately and compet-
ently, undoubtly, the appellate court would have had good cause to to remand for a new
trial, ordered an investigation, or at a minimum, a hearing on the matters.

   The court is now called upon to require the government and Chaney's trial and
appellate counsel to stand on the malicious prosecution and ineffective assistance of

counsel the petitioner was subjected. It is the prosecution who brings the case, including witnesses to trial, and likewise, the defense counsel to subject his case to the crucible of adversarial testing, bringing to the court's attention any material and relevant information that may mitigate the evidence or exonerate her client and, at a minimum, challenge, impeach, or "suppress" the testimony of any witness brought against him. Undoubtly, had this first-hand knowledge been presented to the jury with any reasonable objectiveness, there would have been just cause to acquit Chaney, or at least given the court cause to investigate, suppress testimony, or declare a mistrial.

Counsel was constitutionally ineffective in failing to argue, object, preserve, and develop the record regarding the "exclusion" of materially relevant, exculpatory, and impeachable evidence concerning politically motivated, malicious, and pernicious investigation initiated by the father (Senator) of a cooperating witness, followed by the shameful and contemptous veil put-up by the government, in effort of quiescently quashing the matter. Specifically, counsel failed to interview, investigate, and subpoena the Commonwealth Attorney, Chaney's local attorney, the KY Attorney General, and Senator BRB,Sr. to testify to these issues. Other witnesses were identified who had certain knowledge as well, but were never investigated. It is firmly established in the Sixth Circuit, counsel has a duty to "investigate all witnesses who may have information concerning his or her client's guilt or innocence." Towns, supra, at 258.

Undoubtly, these errors resulted in irreparable harm and prejudice to the defendant, denying him Due Process and ... "defendant's Fifth and Sixth Amendment right to present witnesses that are both material and favorable to their defense." United States v. Valenzuela-Beral, 485 U.S. 858 (1982); Crane v. Kentucky, 476 U.S. 683 (1986); Callahan v. Campbell, 427 F.3d 897,928-32 (11th Cir. 2005) discussing Supreme Court precedents. In addition, "the Supreme Court has clearly established that under the Sixth Amendment, a [state] may not arbitrarily deny a defendant the right to call a witness whose testimony is relevant and material to their defense." Davis v. Straub,

430 F.3d 281 (6th Cir, 2005)  Counsel's ignorance of a key point of law and lack of due diligence in adequate research is of no moment and owed no deference. Surely, the direct examination of a witness in a fair trial - tribunal, in the hearing of the jury, should not be summarily excluded when a defendant's liberty is at stake, irregardless of the station in life the witness occupies. Obviously, Chaney's trial and appellate counsel were constitutionally deficient and objectively unreasonable for failing to notice and appropriately litigate these issues.

It is fundamentally unfair, objectively unreasonable, and prejudicial for the government, the court, or defense counsel to exclude testimony because the witness happens to be a State Senator, Commonwealth Attorney, or current State Attorney General. It was objectively unreasonable as a strategy (of any knid) to merely accept their ex-clusion from the stand without any argument, objection, or preservation for appellate review. Counsel unreasonably forfeited the opportunity to challenge, impeach, and sup-press the testimony of more than one government witness. Appellate counsel was defic-ient for not appropriately litigating these issues on direct appeal. In short, trial, and appellate counsel as well as the government, turned a blind eye.

Post-conviction, on April 16, 2018, one year before direct appeal, Chaney filed pro se (counsel refused to get involved) with the district court, RULE 16, styled MOTION TO COMPEL DISCOVERY, with an attached affidavit. (Exhibit #1)  Appellate coun-sel being fully apprised of the allegations of political coercion and extortion perpet-rated and "brought to light" by a key cooperating government witness, and in possession of materially relevant, meritorious, and mitigating impeachable evidence staring her in the face stated, "I won't be looking at this information until after I file your brief." (direct appeal)  (Exhibits #5(c)(d))  Without any investigation or argument, counsel "unreasonably" forfeited these issues for appellate review, creating irreparable harm and undue prejudice. Conspicuously, the U.S. Attorney and the court failed to re-spond to the statement regarding BRB,Jr.'s sworn statement to the FBI about political

corruption, rather argued only, they were in compliance with discovery to Chaney's counsel in a timely manner, (Exhibit #2) and that Chaney was afforded counsel by the court, not entitled to hybrid representation, and the government was not obligated to return property post-conviction. The motion was denied. (Exhibit #3) Therefore, there is no plausible deniability that the U.S.Attorney was aware of the allegations, made by a cooperating witness, of coercive political activity, in violation of the HOBBS ACT, specifically, by "inducing fear and under color of official right" : § 1951(b)(2). See e.g., United States v. Kelley, 461 F.3d 817826 (6th Cir. 2006); United States v. Abbey, 560 F.3d 513 (6th Cir. 2009)  Particularly, in the Sixth Circuit, there is no paucity of case law regarding these issues. Obviously, the investigators (FBI and Johnson), prosecutors, and counsel had this knowledge well before commencement of trial. It required a particular type of myopia to allow the trial to proceed without objection, argument, litigation, or preservation for appellate review.

In July, 2018, Chaney filed a complaint with the Executive Office of U.S. Attorney's and the Office of Professional Responsibility in Washington, D.C. regarding the U.S. Attorney's handling of BRB,Jr.'s proffered statement to the FBI. They responded that is their policy not to get involved while litigation is pending, noting Chaney was in the process of appealing to the Sixth Circuit. However, it was specifically noted that Chaney had the opportunity to bring these issues on direct appeal, and to consult with his attorney, which obviously fell on deaf ears when he relayed this information. (Exhibit #4)  How much more evident could it be that, even the government felt this was an issue the Appellate Court should hear.

"It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." Rampilla v. Beard, 545 U.S. 374,387, 125 S.Ct. 2d. 360 (2005)(quoting ABA Standards For Criminal Justice, 4-4.1 2d.ed. 1982 supp.) "The duty to investigate exists regardless of the accused's admis-

sion or statement to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty" and "the investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities." (Id.)  Furthermore, an investigation into mitigating evidence is unreasonable when defense counsel "failed to act while potentially powerful mitigating evidence stared them in the face.... or would have been apparent from documents any reasonable attorney would have determined."  Bobby v. VanHook, 558 U.S. 4,11-12, 130 S.Ct. 13 (2007)(citing Wiggins, supra, 539 U.S. at 525; Rampilla, supra, 545 U.S. 374,389-93)

Critically, counsel was objectively unreasonable and negligent for not noticing, arguing, objecting, and preserving for appellate review materially relevant facts in evidence, that could have suppressed the testimony of Johnson, Thad, and cooperating witnesses BRB,Jr. and Dr. "Dusty Chaney", who were the genesis of the malicious investigation and set the tone for the proceedings respectively.

Counsel's failure to notice, litigate, and preserve allegations of coercive political activity and extortion in violation of the HOBBS ACT was objectively unreasonable and inherently prejudicial to Chaney's defense. These issues pierce the very heart of the flagrant and unethical misconduct exhibited throughout this travesty by investigators, prosecutors, and counsel alike, and "shocks the conscious" that these issues have remained egregiously and shamefully veiled by the government since 2013. Counsel's failure to bring these issues to trial and on appeal further degraded the adversarial process guaranteed by the Sixth Amendment, "effectively" preventing the defendant from producing challenging impeachable evidence in the jury's hearing, giving them reason to acquit him.


11.  Appellate counsel's own admission of ineffective assistance is prima ficae prejudicial, created procedural default, and adversely affected the outcome of the proceedings.


63

Evidence of appellate counsel's ineffectiveness could not be more apparent and is embraced by her own admission that, "you have some pretty good arguments for a 2255, including potentially my failure to bring the external influence issue." (Exhibit #5); regretfully admitting that her representation, falling below the Strickland standard, was incompetent, inherently prejudicial, and NOT the product of reasonable professsional judgement, nor subjecting the government's case to the crucible of adversarial testing. This degree of objectively unreasonable misrepresentation created procedural default.

"The special value of the right to the assistance of counsel is the right to effective assistance of counsel." McMann v. Richardson, 397 U.S. 759,771,n14 (1970) Furthermore, "effective assistance of counsel on first appeal as of right held guaranteed by the due process clause of the Fourteeth Amendment." Evitts v. Lucey, 469 U.S. 387 (1985)

Effective assistance of counsel requires the prosecutions case to survive the crucible of meaningful adversarial testing. Appellate counsel's own admission of deficient performance, on multiple issues, is sine qua non evidence that petitioner has demonstrated a reasonable probability that but for, counsel's objectively unreasonable and unprofessional errors, the results of the proceedings would have differed, and that the errors were so serious, that counsel was not functioning as the counsel guaranteed by the Sixth Amendment.

Although the petitioner has pointed to a plethora of "specific objectively unreasonable and inherently prejudicial errors" by trial and appellate counsel, surrounding circumstances such as these, justify an unrebbutable presumption of (prejudice) ineffective assistance of counsel. Appellate counsel's own admission of deficient performance on several critical issues is precisely why petitioner argues that prejudice should be presumed. See Cronic, supra. There is no plausible rebuttable argument to this admission. Had the multiple critical issues discussed in this brief been competent-

ly litigated at trial or on appeal, there is more than reasonable probability that the outcome of the proceedings would have differed, and given the jury several reasons to acquit Chaney. Trial and appellate counsels' inept representation of petitioner was constitutionally ineffective, objectively unreasonable, and resulted in irrefragable prejudice.

CONCLUSION

The court should grant a new trial. If a new trial is premised on counsel's failure to file a suppression motion, the court should order blanket suppression on all seized evidence. In the alternative, the court should grant an (open and public) hearing on all claims.

James A. Chaney, pro-se / Date
(Federal Register: 17746-032)
Federal Prison Camp
P.O. Box  6000
Ashland, KY  41105-6000