# EXHIBIT 14

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

CRIMINAL NO. 14-CR-00037-GFVT

UNITED STATES OF AMERICA                                                PLAINTIFF

V.          SENTENCING MEMORANDUM REGARDING
            DRUG QUANTITY CALCULATION

JAMES ALVIN CHANEY,                                                     DEFENDANTS
LESA L. CHANEY, and
ACE CLINIQUE OF MEDICINE, LLC

* * * * *

Following the conclusion of an evidentiary hearing in this matter, the Court directed the parties to submit Memoranda on the calculation of a Drug Quantity and the calculation of a Health Care Fraud Loss. The Defendants argue that the proper drug quantity for the Defendants is 80,535 milligrams or a marijuana equivalency of 539.6 kilograms supported only by the jury verdict of guilty on counts 2- 62. [R. 464, James Alvin Chaney, Memorandum, page 11.] This is a base offense Level of 24. The United States submits that the drug quantity calculation established by the Presentence Reports (PSR) for all Defendants is accurate.

1

## STATEMENT OF FACTS

The March 3, 2017, PSRs for all Defendants establishes the amount of 277,870.57 kilograms (marijuana equivalency) of Schedule II controlled substances and 79.99 kilograms (marijuana equivalency) of Schedule III controlled substances (277,950.564) as the base offense amount. This is a base offense Level of 38.

The Defendants object to this drug quantity calculation. The Defendant, James Alvin Chaney, has used terminology such as "all-inclusive" calculations [Doc # 464, page 2]. The Defendant, Lesa L. Chaney, has argued that, "The position taken by the government and the probation office – that every medication ever prescribed any patient had no legitimate medical purpose . . . "[Doc # 463, page 1] and ". . . the government and probation office posit that every single controlled substance prescription issued under the DEA number of Dr. James Chaney . . . to any patient at any time should be counted . . . [*Id.* at 2]. Lesa Chaney further argued that the PSR calculations were "all-inclusive." The Defendants' arguments concerning drug quantity are significantly over-reaching and not accurate.

## ARGUMENT

The drug quantity calculation is not limited to the isolated substantive counts for the pre-signed scripts (Counts 2 – 62) as argued by the Defendants. The drug quantity calculation should take into account other "disturbing and illegitimate" practices, including, but not limited to "hundreds" of pre-signed prescriptions, large volumes of

patients daily, short visits with most patients, altered urine screens, quadruple-booked patients, and fabricated patient charts.

To be narrowly and conservatively specific, the drug quantity established in the PSRs is a restricted amount. Indeed, the established drug quantity, " . . . only considered the oxycodone and Schedule III controlled substances in the chart below (41,473.22 grams of actual oxycodone with a marijuana equivalency of 277,870.574 kilograms of marijuana equivalency, and 79.99 marijuana equivalency of Schedule III ) as to the pertinent marijuana equivalency in the instant offense." [PSR, James Alvin Chaney, page 13]. Paragraph 14 of the PSR lists 15 total schedule II controlled substances. However, the drug quantity amount is restricted under Schedule IIs to **oxycodone only.**

Additionally, there is a guidelines cap of 79.99 kilograms for Schedule III controlled substances. The actual mathematical marijuana conversion amount for 5,107,653 Schedule III pills would have been substantially higher. The restriction for drug quantity calculation to the oxycodone (no other Schedule II controlled substances) only and 79.99 kilograms of Schedule III reflects the conservative approach as required by law.

When the exact quantity of drugs attributable to a defendant is undetermined, a court may estimate the amount of drugs as long as a preponderance of the evidence supports the estimate. *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008). This approximation of drug quantity "is not clearly erroneous if it is supported by competent evidence in the record." (*Id.*) "A factual finding is clearly erroneous 'when the

reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *United States v. McGee*, 494 F.3d 551, 554 (6th Cir. 2007) (quoting *Tran v. Gonzales*, 447 F.3d 937, 943 (6th Cir. 2006)). The district court's finding regarding drug quantity used to compute the defendant's sentence, "must be supported by a preponderance of the evidence." *United States v. Young*, 553 F.3d 1035, 1051 (6th Cir. 2009).

For the purposes of this Memorandum, the United States will argue the same approach stated in the Rebuttal Argument. [R. 300: TR (Rebuttal) at 104 -106.] This continuing argument is supported by evidence in the record as well as the court's findings in the Opinion and Order. [R. 371.]

In rebuttal, the United States argued that the most common number of patients per day was 100, multiplied by 5 days to equal 500 patients per week. Giving the Defendants a conservative benefit and assuming that only 70% of his patients received controlled substances, this brings the number to 350 patients per week, multiplied by four weeks per month, for a total of 1,400 controlled substances prescriptions per month. This amount multiplied by 12 months per year equals 16,800 prescriptions per year. The number 16,800 multiplied by 7 years equals 117,600 prescriptions during the time period Ace Clinique was open. The United States argued that Percocet (oxycodone) was prescribed routinely and argued that the average was 90 (Percocet) pills per prescription. (See Exhibits 2 – 5 attached) That amount equaled "2,646,000 pills, distributed by this man,

distributed by the corporation, for which his wife is the president and CEO, within seven years." [R. 300: TR (Rebuttal) at 105.]

For the purposes of this pleading and using Exhibits 2- 5, introduced by the Government at trial, as representative samples, the average milligram strength of the oxycodone (Percocet and Roxicodone) pills that was prescribed is 16 mg. Rounding down and using the conservative estimate that each pill was a 15 mg pill, this provides an estimated number of total grams as 39,690 grams of oxycodone. Using the Marijuana Conversion of "One gram equals 6,700 grams" (James Alvin Chaney PSR, page 13), the total gram equivalency is 265,923,000 grams or 265,923 kilograms. Adding the 79.99 kilograms of marijuana conversion to the above amount creates a drug quantity amount of 266,002.99 kilograms. This amount is less than the PSR amount of 277,950.564. However, both calculated amounts remain identical at a Level 38. Further, if this Court were to reduce the marijuana conversion amount by 50% this would still leave 133,001 kilograms of marijuana, which is also a Base Offense Level 38 in the Sentencing Guidelines.

The Defendants have argued that there is no evidentiary support for a controlled substance quantity other than the pre-signed prescriptions. This restrictive argument concerning the evidence fails to recognize that this Court has previously made findings and rulings based on the strength of the evidence supporting the convictions in its Opinion and Order [R. 371.] That Opinion and Order is applicable to the matter at hand

and takes into account not just the pre-signed prescriptions as argued by the defendants in Counts 2 – 62.

> Instead the evidence demonstrated that Dr. Chaney signed hundreds of blank prescriptions days or weeks in advance, without any foreknowledge of who would ultimately receive those prescriptions. [R.311 at 18-23] Mrs. Chaney would then leave "stacks" of these pre-signed scripts in a drawer for Roy Combs, the office's untrained "IT guy," who would hand them out for distribution by unlicensed and unqualified medical staff. [Id. at 10, 18-23], [Doc #371, at 7]

This finding of the Court that "stacks" and "hundreds" of blank prescriptions were signed by Dr. Chaney and were filled out by unqualified personnel greatly expands the drug quantity from the unduly restrictive argument of the Defendants that the drug quantity calculation should only be limited to Counts 2 – 62.

Further, this Court held in the same ruling that:

> Dr. Chaney admitted to pre-signing prescriptions that were later distributed by unqualified staff, often while he and Mrs. Chaney were on vacation. [R. 318 at 114-5] Gregory Hoskins, a physician's assistant, and Shannon Wilder, a nurse practitioner, habitually issued these pre-signed prescriptions, despite the fact that neither were licensed to prescribe controlled substances. [Id. at 115] Combs also testified that Dr. Chaney instructed him "not to tell anyone" about the pre-signed scripts. [R. 321 at 19] **And all of this behavior occurred in the context of the Clinique's other disturbing and illegitimate practices, as evidenced by testimony that the Chaneys altered urine drug screens to conceal evidence of patients' drug abuse and/or diversion, quadruple-booked patients into fifteen-minute time slots, forced others to wait for up to eight hours to be seen, and fabricated patients charts.** [R. 340 at 9, 339 at 7; R. 335 10-11, R. 344 at 19, R. 336 at 5, R. 293 at 51-51, r. 321 at 101] [R. 371 page 9] (Emphasis added)

The restrictive argument of the Defendants' that the drug quantity calculation should be limited to the counts of convictions for the pre-signed prescription lacks substance. This Court's finding that "**all of this behavior occurred in the context of the**

6

**Clinique's other disturbing and illegitimate practices"** is directly on point and relevant to a drug quantity calculation.

The evidence at trial conclusively determined that it was not the legitimate practice of medicine to require a urine drug screen from every patient every single time they came to Ace Clinique.

> The Government introduced evidence that the Clinique was the number one biller in the state for urine drug screen during this period, accounting "for an astounding ten percent of all urine drugs screens billed in the Commonwealth of Kentucky" [R. 310 at 10]. Martha Smith recalled that the Clinique "probably did anywhere from 80 to 100 drug screens a day." [R. 341 at 6.]

This Court found further evidence of the unlawful dispensation of controlled substances, which the United States would argue are inclusive as to a controlled substance calculation,

> that she (Lesa Chaney) would triple and quadruple-book patients, that 'there was a clear indication . . . there were too many patients, too long of a wait,' that she fabricated patient charts, that she forged Dr. Chaney's signature on medical records, and that she 'knew what the billings were. [R. 267 at 11]. [R. 371, at 15]

Further, this Court noted the testimony of witnesses who stated that patients were seen for only a few minutes.

> Kathleen Caudill, for example, stated that the Clinique's providers would sometimes see four patients in a fifteen-minute period for a total of twelve patients and hour. [R 335 at 10-11.] James Fields testified that 'a lot of time[s] these slots were 'quadruple-booked,' and visits with providers lasted 'very few minutes.' [R. 344 at 19] Randall Huff recalled that the Clinique sometimes saw '[a] hundred patients a day. [R. 294 at 10.] . . . Wilder described the frequency and volume of patients as akin to 'herding cattle,' and stated that providers 'got them in there an [ ] got them out of there. [R. 332 at 24] [R. 371 at 44]

This Court held that, "[a]t least eight witnesses also testified that urine drug screens were routinely altered at the Clinique. " [R.292 at 57-58, R. 294 at 10-15, R. 321 at 27, R. 337 at 9, R.338 at 15, R. 339 at 10, R. 3430 at 7-7, R. 344 at 11], all at [R. 371 at 46.]

## CONCLUSION

The PSR reflects a drug quantity calculation of 41,473.22 grams of actual Oxycodone with a marijuana equivalency of 277,870.574 kilograms of marijuana equivalency, and 79.99 marijuana equivalency of Schedule III controlled substances. This is a Level 38 guidelines calculation.

The United States in its Rebuttal argument argued a pill quantity of 2,646,000 pills over a period of 7 years. By using representative samples of an conservative average of 90 oxycodone pills per prescription with an average of 15 mg per pill this equaled 266,002.99 kilograms. This amount is less than the PSR amount of 277,950.564. However, both calculated amounts (from the PSR and the Unites States Rebuttal Argument as extended in this pleading) remain identical at a Base Offense Level 38.

As a practical matter, if this Court were to reduce the above marijuana conversion amount of 266,002.99 kilograms by 50%, this amount would be 133,001 kilograms of marijuana. The outcome is the same at a Level 38.

The United States urges this Court to adopt a guideline calculation of a Base Offense Level 38 for Count Group 1, Conspiracy to Distribute Schedule II and III Controlled Substances (Counts 1-62).

Respectfully submitted,

CARLTON S. SHIER, IV
ACTING UNITED STATES ATTORNEY

By:   s/Roger W. West
Assistant United States Attorney
260 W. Vine Street, Suite 300
Lexington, Kentucky 40507-1612
(859) 685-4895
FAX (859) 233-2658
Roger.West@usdoj.gov

CERTIFICATE OF SERVICE

On September 15, 2017, I electronically filed this motion through the ECF system, which will send the notice of electronic filing to all counsel of record.

s/Roger W. West
Assistant United States Attorney