```
1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF KENTUCKY
2                   SOUTHERN DIVISION AT LONDON

3    UNITED STATES OF AMERICA,

4           PLAINTIFF,
                                     Criminal No. 6:14-CR-37
5    VS.                             At London, Kentucky
                                     Thursday, August 17, 2017
6                                    10:09 a.m.

7    JAMES ALVIN CHANEY, M.D.,
     a/k/a ACE CHANEY, LESA L. CHANEY,
8    and ACE CLINIQUE OF MEDICINE, LLC,

9           DEFENDANTS.


10       TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS
11   BEFORE U.S. DISTRICT JUDGE GREGORY F. VAN TATENHOVE
                     Day 1 of 2 Days
12
     APPEARANCES:
13
     For the Plaintiff:    Hon. Paul McCaffrey
14                         Hon. Roger West
                           Assistant United States Attorneys
15                         260 West Vine Street
                           Suite 300
16                         Lexington, Kentucky  40507-1612
                           (859) 685-4895
17
     For the Defendant     Hon. Christy Love
18   James A. Chaney       Love Law Firm, PLLC
     and Ace Clinique      333 North Main Street, Suite B
19   of Medicine, LLC:     London, Kentucky  40744
                           (606) 312-5683
20
     For the Defendant     Hon. Robert L. Abell
21   Lesa L. Chaney:       120 North Upper Street
                           P. O. Box 983
22                         Lexington, Kentucky 40588-0983
                           (859) 254-7076
23

24       Proceedings recorded by mechanical stenography,
     transcript produced by computer.
25
```

**EXHIBIT E**

1

2                          INDEX

3    Colloquy                                    3-9

4                    Government's Proof

5    Direct Examination of THAD LAMBDIN
          By:  Mr. West                          9-40
6
     Cross-examination
7         By:  Ms. Love                         40-51

8    Cross-examination
          By:  Mr. Abell                        51-53
9
     Redirect Examination
10        By:  Mr. West                         53-55

11   Direct Examination of ASPEN RENAE TAYLOR
          By:  Mr. McCaffrey                     56-66
12
     Cross-examination
13        By:  Ms. Love                         66-70

14   Cross-examination
          By:  Mr. Abell                        71-72
15
     Redirect Examination
16        By:  Mr. McCaffrey                     73-74

17   Recross-examination
          By:  Ms. Love                           74
18
                    Defense Proof
19
     Direct Examination of JAMES ALVIN ACE CHANEY
20        By:  Ms. Love                         78-109

21   Cross-examination
          By:  Mr. West                        109-122
22
     Redirect Examination
23        By:  Ms. Love                        122-123

24   Colloquy                                 123-129

25   Reporter's Certificate                        129

```
 1                    DIRECT EXAMINATION

 2       BY:  MR WEST:

 3       Q.      Would you state your name and your

 4  occupation, please, sir.

 5       A.      Yes.  My name is Thad Lambdin.  I'm a

 6  special agent with the FBI.

 7       Q.      Agent Lambdin, how long have you been with

 8  the FBI?

 9       A.      Since 2003.

10       Q.      And what is your current assignment?

11       A.      I'm a special agent in London, Kentucky.

12       Q.      And how long have you been at the London

13  resident office?

14       A.      Approximately seven years.

15       Q.      Were you the primary case agent for the

16  FBI in this matter pending before the Court at this

17  time?

18       A.      Yes, I was.

19       Q.      What are some of your duties and

20  responsibilities there as an FBI agent in the London

21  office?

22       A.      I do investigations of criminal matters, a

23  variety of criminal matters.  I also am a digital

24  extraction technician, so I've been trained to extract

25  digital evidence from hard drives, that type of thing,
```

Case: 6:14-cv-00007-REW-HAI   Doc #: 162-15   Filed: 01/23/24   Page: 4 of 9 - Page ID#: 1098
Case: 6:14-cr-00037-GFVT-HAI   Doc #: 459   Filed: 08/25/17   Page: 10 of 129 - Page ID#: 9452

10

 1  and then actually do preliminary reviews and searches

 2  on those.

 3      Q.      All right.  Now, how long have you been a

 4  data extraction technician?

 5      A.      I'd say it's probably about four years.  I

 6  don't have the exact date.

 7      Q.      And you testified in the trial of these

 8  two defendants and the corporation, correct?

 9      A.      Yes.

10      Q.      And you understand -- you've been informed

11  what we're here for today, to determine pill quantity

12  and amount of loss, correct?

13      A.      That is correct.

14      Q.      Did you do anything in particular in

15  regards to determining a pill quantity for this matter

16  before this Court?

17      A.      Yes.  In September of 2014, TFO James Pace

18  obtained the KASPER records.  And basically, I

19  imported the records into an Excel spreadsheet, kept

20  them down to the 2007, 1-1-2007, to the end date,

21  which was, I believe, August 2014.  And then at -- on

22  a monthly basis, basically did a tally of the

23  different types of drugs that were dispensed that were

24  in the KASPER reports, prescription by prescription,

25  did summary sheets for both Schedule II and Schedule

 1   III.

 2        Q.      All right.  So just for the purpose of the

 3   record, although I'm sure nearly every person in this

 4   courtroom by this time understands what a KASPER

 5   record is, but if you would explain that, please.

 6        A.      A KASPER record -- the state of Kentucky

 7   has a -- a program in place where as people fill their

 8   prescriptions at different pharmacies, the pharmacist

 9   enters the data into the system and it's collected at

10   the state.

11        Q.      Now, let me ask a couple of preliminary

12   questions.  Is that KASPER system statewide?

13        A.      Yes, it is.

14        Q.      So it doesn't apply to any prescriptions

15   that were filled in Ohio, Illinois, Indiana, West

16   Virginia or Tennessee, correct?

17        A.      That's correct, nothing filled out of

18   state.

19        Q.      All right.  And it doesn't apply to a

20   prescription that's written, but just a prescription

21   that's actually filled at a pharmacy, correct?

22        A.      That's correct, only at the time of

23   filling is it completed.

24        Q.      All right.  And is every pharmacy in the

25   state that's licensed required to contribute or

```
 1  know, where, for example, if someone has a complaint
 2  of chronic pain, which means pain for three months on
 3  a daily basis, or longer, that's, by definition, a
 4  chronic pain.  But we had a psychosocial evaluation
 5  done on people.  Each and every visit someone had a
 6  KASPER profile ran on them before they came in to be
 7  seen.  They had urine drug testing.  They had
 8  specialty consultation.  If it was, for example, a --
 9  potentially a surgical patient, they may see a
10  neurosurgeon or an orthopedic surgeon, or may be
11  seeing a rheumatologist for something that's not
12  operable, for example, and, of course, pain management
13  specialty, which was not available at home either.
14        Q.      What's a pain management specialist?
15        A.      Well, a pain specialist, someone who is
16  certified in pain management, and that is what they
17  do.
18        Q.      Who did you use?
19        A.      Dr. Wright primarily.
20        Q.      Okay.  So you -- you used another doctor
21  to review your files?
22        A.      Correct.
23        Q.      Okay.  You mentioned KASPER.  Did you ever
24  notice any errors on KASPER when you were dealing with
25  patients?
```

1      A.      KASPER is fraught with errors.  We had a

2  document that we received that had 1,208 prescriptions

3  on it actually, and all of them --

4      Q.      Your prescriptions?

5      A.      Right.  They were -- they were alleged my

6  prescriptions; not all of them were, a significant

7  amount of them were.

8          But there were other physicians, there's

9  nurse practitioners and so forth listed on 'em, and

10 out of the 1,208, I think 1,207 were wrong.

11     Q.      Okay.  And those KASPER prescriptions or

12 the list that you got from KASPER indicated that you,

13 with your DEA number, had prescribed them?

14     A.      Correct.  And, you know, it may have been

15 a problem with the date, for example.  If the

16 prescription's written, for example, on July 1, and

17 not filled until July 5, then the pharmacy would

18 erroneously put down it was July 5 as the date of the

19 prescription.

20     Q.      Okay.  And also, did you find errors of

21 other names besides you that prescribed the

22 medication?

23     A.      Absolutely, uh-huh.

24     Q.      Okay.  Did you compare the KASPER with

25 your actual files?

```
 1      A.      You mean as I was -- as we were seeing
 2  patients?
 3      Q.      As you were looking for errors.
 4      A.      Oh, yeah, absolutely.  And then we'd
 5  actually pull the actual prescription is where you'd
 6  find the error.
 7      Q.      So regarding your patients, did you -- did
 8  you -- did you care about 'em?
 9      A.      Of course.  I mean, what kind of
10  question -- of course, I did.
11      Q.      Well, some -- I would -- I'd say it's a
12  legitimate question; I'd say some doctors don't care.
13  And did you have some patients that would treat with
14  you for years?
15      A.      Oh, absolutely.
16      Q.      Okay.  You're aware that there's a doctor
17  that reviewed 200 files, aren't you?
18      A.      Correct.
19      Q.      Okay.  And that there's some -- some
20  indications that he couldn't access files.  I want to
21  talk to you about some of those patients.  Do you
22  mind?
23      A.      Sure.
24      Q.      To see where you -- you believe those
25  files were and what is your recollection about the
```