Case: 6:14-cr-00037-GFVT-HAI   Doc #: 4     Filed: 08/25/17   Page: 1 of 129 - Page ID#: 9443

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT LONDON

UNITED STATES OF AMERICA,

     PLAINTIFF,

                         Criminal No. 6:14-CR-37
VS.                       At London, Kentucky
                        Thursday, August 17, 2017
                        10:09 a.m.

JAMES ALVIN CHANEY, M.D.,
a/k/a ACE CHANEY, LESA L. CHANEY,
and ACE CLINIQUE OF MEDICINE, LLC,

     DEFENDANTS.

     TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS
BEFORE U.S. DISTRICT JUDGE GREGORY F. VAN TATENHOVE
               ***Day 1 of 2 Days***

APPEARANCES:

For the Plaintiff:    Hon. Paul McCaffrey
                        Hon. Roger West
                        Assistant United States Attorneys
                        260 West Vine Street
                        Suite 300
                        Lexington, Kentucky  40507-1612
                        (859) 685-4895

For the Defendant    Hon. Christy Love
James A. Chaney      Love Law Firm, PLLC
and Ace Clinique    333 North Main Street, Suite B
of Medicine, LLC:    London, Kentucky  40744
                        (606) 312-5683

For the Defendant    Hon. Robert L. Abell
Lesa L. Chaney:      120 North Upper Street
                        P. O. Box 983
                        Lexington, Kentucky 40588-0983
                        (859) 254-7076

     Proceedings recorded by mechanical stenography,
transcript produced by computer.

**EXHIBIT E**

INDEX

Colloquy                                                    3-9

                    Government's Proof

Direct Examination of THAD LAMBDIN
     By:  Mr. West                                         9-40

Cross-examination
     By:  Ms. Love                                         40-51

Cross-examination
     By:  Mr. Abell                                        51-53

Redirect Examination
     By:  Mr. West                                         53-55

Direct Examination of ASPEN RENAE TAYLOR
     By:  Mr. McCaffrey                                    56-66

Cross-examination
     By:  Ms. Love                                         66-70

Cross-examination
     By:  Mr. Abell                                        71-72

Redirect Examination
     By:  Mr. McCaffrey                                    73-74

Recross-examination
     By:  Ms. Love                                           74

                    Defense Proof

Direct Examination of JAMES ALVIN ACE CHANEY
     By:  Ms. Love                                        78-109

Cross-examination
     By:  Mr. West                                       109-122

Redirect Examination
     By:  Ms. Love                                       122-123

Colloquy                                                 123-129

Reporter's Certificate                                       129

```
1                      DIRECT EXAMINATION

2         BY:  MR WEST:

3         Q.      Would you state your name and your

4   occupation, please, sir.

5         A.      Yes.  My name is Thad Lambdin.  I'm a

6   special agent with the FBI.

7         Q.      Agent Lambdin, how long have you been with

8   the FBI?

9         A.      Since 2003.

10        Q.      And what is your current assignment?

11        A.      I'm a special agent in London, Kentucky.

12        Q.      And how long have you been at the London

13  resident office?

14        A.      Approximately seven years.

15        Q.      Were you the primary case agent for the

16  FBI in this matter pending before the Court at this

17  time?

18        A.      Yes, I was.

19        Q.      What are some of your duties and

20  responsibilities there as an FBI agent in the London

21  office?

22        A.      I do investigations of criminal matters, a

23  variety of criminal matters.  I also am a digital

24  extraction technician, so I've been trained to extract

25  digital evidence from hard drives, that type of thing,
```

1  and then actually do preliminary reviews and searches

2  on those.

3      Q.      All right.  Now, how long have you been a

4  data extraction technician?

5      A.      I'd say it's probably about four years.  I

6  don't have the exact date.

7      Q.      And you testified in the trial of these

8  two defendants and the corporation, correct?

9      A.      Yes.

10     Q.      And you understand -- you've been informed

11 what we're here for today, to determine pill quantity

12 and amount of loss, correct?

13     A.      That is correct.

14     Q.      Did you do anything in particular in

15 regards to determining a pill quantity for this matter

16 before this Court?

17     A.      Yes.  In September of 2014, TFO James Pace

18 obtained the KASPER records.  And basically, I

19 imported the records into an Excel spreadsheet, kept

20 them down to the 2007, 1-1-2007, to the end date,

21 which was, I believe, August 2014.  And then at -- on

22 a monthly basis, basically did a tally of the

23 different types of drugs that were dispensed that were

24 in the KASPER reports, prescription by prescription,

25 did summary sheets for both Schedule II and Schedule

 1   III.

 2       Q.       All right.  So just for the purpose of the

 3   record, although I'm sure nearly every person in this

 4   courtroom by this time understands what a KASPER

 5   record is, but if you would explain that, please.

 6       A.       A KASPER record -- the state of Kentucky

 7   has a -- a program in place where as people fill their

 8   prescriptions at different pharmacies, the pharmacist

 9   enters the data into the system and it's collected at

10   the state.

11       Q.       Now, let me ask a couple of preliminary

12   questions.  Is that KASPER system statewide?

13       A.       Yes, it is.

14       Q.       So it doesn't apply to any prescriptions

15   that were filled in Ohio, Illinois, Indiana, West

16   Virginia or Tennessee, correct?

17       A.       That's correct, nothing filled out of

18   state.

19       Q.       All right.  And it doesn't apply to a

20   prescription that's written, but just a prescription

21   that's actually filled at a pharmacy, correct?

22       A.       That's correct, only at the time of

23   filling is it completed.

24       Q.       All right.  And is every pharmacy in the

25   state that's licensed required to contribute or

Case: 6:24-cv-00007-REW-HAI   Doc #: 60-6   Filed: 02/22/24   Page: 6 of 8 - Page ID#:
Case: 6:14-cr-00037-GFVT-HAI   Doc #: 45   1774 iled: 08/25/17   Page: 84 of 129 - Page ID#:
9526

84

```
 1   know, where, for example, if someone has a complaint
 2   of chronic pain, which means pain for three months on
 3   a daily basis, or longer, that's, by definition, a
 4   chronic pain.  But we had a psychosocial evaluation
 5   done on people.  Each and every visit someone had a
 6   KASPER profile ran on them before they came in to be
 7   seen.  They had urine drug testing.  They had
 8   specialty consultation.  If it was, for example, a --
 9   potentially a surgical patient, they may see a
10   neurosurgeon or an orthopedic surgeon, or may be
11   seeing a rheumatologist for something that's not
12   operable, for example, and, of course, pain management
13   specialty, which was not available at home either.
14        Q.      What's a pain management specialist?
15        A.      Well, a pain specialist, someone who is
16   certified in pain management, and that is what they
17   do.
18        Q.      Who did you use?
19        A.      Dr. Wright primarily.
20        Q.      Okay.  So you -- you used another doctor
21   to review your files?
22        A.      Correct.
23        Q.      Okay.  You mentioned KASPER.  Did you ever
24   notice any errors on KASPER when you were dealing with
25   patients?
```

Case: 6:24-cv-00007-REW-HAI   Doc #: 60-6   Filed: 02/22/24   Page: 7 of 8 - Page ID#:
Case: 6:14-cr-00037-GFVT-HAI   Doc #: 461775 Filed: 08/25/17   Page: 85 of 129 - Page ID#:
9527

85

```
 1      A.      KASPER is fraught with errors.  We had a

 2  document that we received that had 1,208 prescriptions

 3  on it actually, and all of them --

 4      Q.      Your prescriptions?

 5      A.      Right.  They were -- they were alleged my

 6  prescriptions; not all of them were, a significant

 7  amount of them were.

 8          But there were other physicians, there's

 9  nurse practitioners and so forth listed on 'em, and

10  out of the 1,208, I think 1,207 were wrong.

11      Q.      Okay.  And those KASPER prescriptions or

12  the list that you got from KASPER indicated that you,

13  with your DEA number, had prescribed them?

14      A.      Correct.  And, you know, it may have been

15  a problem with the date, for example.  If the

16  prescription's written, for example, on July 1, and

17  not filled until July 5, then the pharmacy would

18  erroneously put down it was July 5 as the date of the

19  prescription.

20      Q.      Okay.  And also, did you find errors of

21  other names besides you that prescribed the

22  medication?

23      A.      Absolutely, uh-huh.

24      Q.      Okay.  Did you compare the KASPER with

25  your actual files?
```

Case: 6:24-cv-00007-REW-HAI   Doc #: 60-6   Filed: 02/22/24   Page: 8 of 8 - Page ID#:
Case: 6:14-cr-00037-GFVT-HAI   Doc #: 455   Filed: 08/25/17   Page: 86 of 129 - Page ID#:
9528

86

```
 1      A.      You mean as I was -- as we were seeing

 2 patients?

 3      Q.      As you were looking for errors.

 4      A.      Oh, yeah, absolutely.  And then we'd

 5 actually pull the actual prescription is where you'd

 6 find the error.

 7      Q.      So regarding your patients, did you -- did

 8 you -- did you care about 'em?

 9      A.      Of course.  I mean, what kind of

10 question -- of course, I did.

11      Q.      Well, some -- I would -- I'd say it's a

12 legitimate question; I'd say some doctors don't care.

13 And did you have some patients that would treat with

14 you for years?

15      A.      Oh, absolutely.

16      Q.      Okay.  You're aware that there's a doctor

17 that reviewed 200 files, aren't you?

18      A.      Correct.

19      Q.      Okay.  And that there's some -- some

20 indications that he couldn't access files.  I want to

21 talk to you about some of those patients.  Do you

22 mind?

23      A.      Sure.

24      Q.      To see where you -- you believe those

25 files were and what is your recollection about the
```