President and Chief Executive Officer of **ACE CLINIQUE OF MEDICINE, LLC**.

    4.    **JAMES ALVIN CHANEY, LESA L. CHANEY,** and **ACE CLINIQUE OF MEDICINE, LLC** submitted claims for payment to Medicare, Kentucky Medicaid and private insurers.

    **B.**    **Controlled Substances**

    5.    21 C.F.R. § 1306.04(a) provides: A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of Section 309 of the Controlled Substance Act (21 U.S.C. § 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

    6.    21 C.F.R. § 1306.05(a) provides: All prescriptions for controlled substances shall be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner.

    7.    Schedule II drugs, including oxycodone, are used with severe restrictions because of their potential for abuse, which abuse may lead to severe psychological and

**EXHIBIT 2**

physical dependence.

8. Schedule III drugs, including Hydrocodone, have a potential for abuse less than the drugs in Schedule II, but are drugs which, if abused, may lead to moderate and low physical dependence or high psychological dependence.

C. **Medicare and Medicaid**

9. Medicare is a health care benefit program under 18 U.S.C. § 24(b); that is, a public or private plan or contract, affecting commerce, under which medical benefits, items and services were provided to individuals.

10. Medicare Part B (Medical Insurance) helped cover doctors' services, outpatient care, and supplies when they are ordered by a doctor and are medically necessary. Medicare Part B paid for 80% of the allowed amount of medically necessary physician services, outpatient services and other medical services. The remaining 20% of the Part B charges were to be paid by the Medicare beneficiary.

11. Medicare Part D subsidized the costs of prescription drugs for Medicare beneficiaries in the United States. It was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 and went into effect on January 1, 2006. Part D benefits were administered by private insurance plans that were reimbursed by Medicare through CMS.

12. Beneficiaries could obtain Part D benefits in two different ways: they could join a Prescription Drug Plan which covered only prescription drugs; or they could join a Medicare Advantage Plan that covered both prescription drugs and medical services.

**EXHIBIT 2**

13.     Typically, a Medicare beneficiary enrolled in a Medicare Part D plan would fill their prescription at a pharmacy utilizing their Medicare Part D plan coverage to pay for the prescription. The pharmacy would then submit the prescription claim for reimbursement to the Medicare Part D beneficiary's plan for payment under the beneficiary's Health Insurance Claim Number and/or Medicare Plan identification number.

14.     Medicaid was a health care benefit program under 18 U.S.C. § 24(b). Kentucky Medicaid ("Medicaid") is jointly funded by the Commonwealth of Kentucky and the federal government. Claims for Medicaid beneficiaries were sent to the fiscal agent for the Kentucky Medicaid Management Information System for payment. Beneficiaries were required to meet certain conditions to get these benefits.

15.     The Centers for Medicare & Medicaid Services ("CMS") was a federal agency within the United States Department of Health and Human Services and was responsible for administering the Medicare and Medicaid programs. CMS had the authority to make coverage and medical necessity determinations.

16.     At all times relevant, Medicare and Medicaid prohibited payment for items and services that were not "reasonable and necessary" for the diagnosis and treatment of an illness or injury. Medicare claim forms, for example, required the provider who made a claim for services to certify that the services were "medically indicated and necessary for the health of the patient."

17.     Federal regulations require that healthcare practitioners provide services which are provided economically and only when, and to the extent, medically necessary;

4

**EXHIBIT 2**

are of a quality which meets professionally recognized standards of healthcare; and are supported by evidence of medical necessity and quality in such form and fashion and at such time as may reasonably be required by a reviewing peer review organization in the exercise of its duties and responsibilities.  42 U.S.C. § 1395y(a)(1)(A).

18.    **JAMES ALVIN CHANEY and ACE CLINIQUE OF MEDICINE,**

**LLC** provided services to Medicare and Medicaid beneficiaries, as well as beneficiaries insured by private health insurance plans.

### D.    Health Care Billing

19.    Medical providers and health care benefit programs utilized well-known and standard insurance processing codes to identify the service provider, the medical diagnoses, and the medical treatments or procedures rendered to a patient.

20.    Each licensed medical provider, such as a physician, physician's assistant, or nurse practitioner, had a unique code called a National Provider Identifier, or NPI. With the NPI number, the health care provider enrolled with CMS to become eligible to bill Medicare and Medicaid for services rendered to covered beneficiaries.

21.    The Kentucky Department of Medicaid Services administers Medicaid in Kentucky.  A health care provider must undergo and pass an approval process and enter into a written provider agreement before being allowed to claim Medicaid reimbursement in Kentucky.  Upon approval, Medicaid internally assigns the provider a unique Medicaid Provider Number (MPN) that is associated with the provider's unique National Provider Identifier number and the appropriate taxonomy code.  A health care provider who submits a claim with Kentucky Medicaid is required to identify himself using his unique

5

**EXHIBIT 2**

NPI and a taxonomy code. Kentucky Medicaid receives, processes, and pays those claims according to Medicaid rules, regulations and procedures, and by matching the health care provider's NPI and taxonomy code with the internally assigned MPN.

22. The numerical codes for medical diagnoses were published in the International Classification of Diseases, Ninth Revision, Clinical Modification. The codes are commonly referred to as ICD-9 codes.

23. The numerical codes for medical procedures were published in the American Medical Association's Physicians' Current Procedural Terminology. These codes are commonly referred to as CPT codes.

24. Medical providers commonly record diagnosis and procedure codes on a form referred to as a "superbill" during the course of the examination of a patient or the performance of a medical procedure.

25. The provider's NPI and the diagnosis and procedure codes were later recorded on a standard claim form known as the CMS 1500 form, which the medical provider would send to the patient's health care benefit program, or the data from which the medical provider would submit electronically to the patient's health care benefit program, for payment. Whether submitted in paper form or electronically, the health care benefit program would rely on such information in evaluating the claims for payment.

26. When each claim was submitted for payment, either in paper form or electronically, the treating physician certified to the health care benefit program that (1) the services shown on the form were medically indicated and necessary for the health of the patient, and (2) were personally furnished by the physician or were furnished incident

6

**EXHIBIT 2**

to the physician's professional service by the physician's employee under his immediate personal supervision.

27.     The health care benefit programs relied on this certification, the NPI, the diagnosis codes, and the CPT codes, and only provided medical providers payment on claims if the services were medically reasonable and necessary and either personally furnished by the physician or under his immediate personal supervision.

28.     A physician cannot bill for services furnished incident to the physician's professional service by the physician's employee rendered in a hospital setting.

29.     Health care providers could submit a bill for office visits using the following evaluation and management codes for new patients: 99201, 99202, 99203, 99204 and 99205. For established patients, the following evaluation and management codes were used: 99211, 99212, 99213, 99214, or 99215. Determination of the proper CPT code depended on the nature of the office visit. Specifically, the CPT Code described codes 99211 through 99214 as follows:

    a.     99211: Office or other outpatient visit for the evaluation and management of an established patient that may not require the presence of a physician. Usually, the presenting problem(s) are minimal. Typically, 5 minutes are spent performing or supervising these services.

    b.     99212: Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 components: (1) a problem-focused history; (2) a problem-focused examination; (3) straightforward medical decision-making. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are self-limited or minor. Physicians typically spend 10 minutes face-to-face with the patient and/or family.

**EXHIBIT 2**

c.      99213: Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 components: (1) an expanded problem-focused history; (2) an expanded problem-focused examination; (3) medical decision-making of low complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of low to moderate severity. Physicians typically spend 15 minutes face-to-face with the patient and/or family.

d.      99214: Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 key components: (1) a detailed history; (2) a detailed examination; (3) medical decision-making of moderate complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of moderate to high severity. Physicians typically spend 25 minutes face-to-face with the patient and/or family.

30.      The more complex the office visit, the higher the rate of reimbursement for the provider. Medicare and Medicaid will only pay providers for services that are actually performed.

### E.      Clinical Diagnostic Laboratories

31.      **ACE CLINIQUE OF MEDICINE, LLC** operated a clinical laboratory to test, among other things, urine drug screens.

32.      Clinical diagnostic laboratories performing high complexity testing are required to employ a sufficient number of individuals who meet the qualification requirements of 42 C.F.R. § 493.1489.

### F.      Urine Drug Screens

33.      Drugs of abuse testing may be useful in the clinical setting because it may provide objective information to assist the provider in diagnosing and making treatment

**EXHIBIT 2**

decisions. Clinicians may use qualitative and quantitative drugs of abuse testing to look for the presence or absence of drugs in the body.

34.    Qualitative drug testing is generally used to determine the presence or absence of a drug or drug metabolite in the sample. The test result is expressed in non-numerical terms, with a negative or positive result.

35.    Quantitative drug testing is generally used when it is medically necessary to determine a specific quantity of drug or drug metabolite present in the sample. The test result is expressed in numerical terms.

36.    Clinicians must have choice in selecting which drugs to test and when, and all testing should be tailored to the individual patient under consideration. Providers are to carefully consider the drug/drug classes to be tested.

37.    Drugs or classes for which screening is performed should reflect only those likely to be present, based on the patient's medical history or current clinical presentation.

38.    Physicians are required to utilize urine drug screens in a random manner at appropriate times to determine whether the patient is taking prescribed medications or taking illegal substances or medications not prescribed by the physician. A patient deemed "low risk" should be screened at least once a year, a patient deemed "moderate risk" should be screened at least twice a year, and a patient considered "high risk" should be screened three to four times per year.

39.    Medicare and Medicaid do not pay for routine urine drug screening.

40.    Effective July 18, 2008, guidelines were issued under which Medicare

9

**EXHIBIT 2**

would allow payment for qualitative urine drug screening using CPT code 80101. Effective April 2010, CPT 80101 was discontinued.

41.     CPT code GO431 was thereafter temporarily set into effect to pay for only one unit of drug screening.

42.     Effective January 11, 2011, CPT code GO434 was instituted to cover drug screens using moderate complexity test methods. Providers were allowed to bill only one unit for both GO431 and GO434.

43.     Medicare contains certain Procedure-to-Procedure edits that define when certain CPT codes should be reported together. If certain codes are reported on the same date of service, the first code is eligible for payment while the additional codes are denied.

44.     Modifier 59 is used to bypass this edit and obtain payment for multiple procedures on the same day of service. Modifier 59 is appropriately used only when the provider renders multiple services not ordinarily encountered or performed on the same day by the same individual.

45.     Modifier 59 should not be used to bypass a Procedure-to-Procedure edit unless the proper criteria for use of the modifier are met.

G.     **Magnetic Resonance Imaging**

46.     Magnetic resonance imaging (MRI) of the spine is an imaging technique used to determine if bone, nerve, spinal cord, vertebral disc or muscle damage exists in the cervical, thoracic or lumbar spine. MRI is usually performed in response to a neurologic deficit.

10

**EXHIBIT 2**

47.     Neurologic deficit exists when muscle is atrophied, sensation is abnormal or focal weakness is noted. A neurologic deficit usually indicates damage to the spine or impingement of a nerve. Thus radicular pain or pain radiating from the back is an indication for MRI to rule out tumor, disc herniation or abscess impinging a nerve.

48.     After the initial evaluation, repeat MRIs of the same portion of the spine would not be indicated unless the pattern of pain changed or new neurologic deficit developed.

## Controlled Substances Scheme

## COUNT 1
## 21 U.S.C. § 846

49.     On or about March 7, 2006, the exact date unknown, and continuing through on or about October 21, 2014, in Perry County, in the Eastern District of Kentucky,

**JAMES ALVIN CHANEY, M.D.,**
**aka ACE CHANEY,**
**LESA L. CHANEY,**
**ACE CLINIQUE OF MEDICINE, LLC,**

and others, did knowingly and intentionally conspire to unlawfully distribute and unlawfully dispense Schedule II controlled substances and Schedule III controlled substances, that is, issue prescriptions not for legitimate medical purpose and outside the usual course of professional medical practice, contrary to 21 C.F.R. § 1306.04(a), in violation of 21 U.S.C. § 841(a) (1), and all in violation of 21 U.S.C. § 846.

11

**EXHIBIT 2**

## COUNTS 2-13
## 21 U.S.C. § 841(a)(1)
## 18 U.S.C. § 2

50.   On or about June 11, 2010, in Perry County, in the Eastern District of

Kentucky,

### JAMES ALVIN CHANEY, M.D.,
### aka ACE CHANEY, and
### ACE CLINIQUE OF MEDICINE, LLC,

aided and abetted by others, did knowingly and intentionally unlawfully distribute and

unlawfully dispense Schedule II controlled substances by having unauthorized employees

issue prescriptions in his absence using prescriptions that he had previously signed in

blank to the individuals listed below:

| Count | Recipient | Substance | Amount |
|-------|-----------|-----------|--------|
| 2 | J. C. | Oxycodone | 60 |
| 3 | D. W. | Oxycodone | 120 |
| 4 | B. E. | Oxycodone | 120 |
| 5 | S.D. | Oxycodone | 60 |
| 6 | J.L. | Oxycodone | 120 |
| 7 | A. B. | Oxycodone | 60 + 90 |
| 8 | V. M. | Oxycodone | 120 |
| 9 | F. S. | Oxycodone | 120 |
| 10 | T. S. | Oxycodone | 120 |
| 11 | N. C. | Oxycodone | 90 |
| 12 | J. B. | Oxycodone | 60 + 60 |
| 13 | B. C. | Oxycodone | 120 |

Contrary to 21 C.F.R. § 1306.05(a), and each count in violation of 21 U.S.C. § 841(a)(1)

and 18 U.S.C. § 2.

12

**EXHIBIT 2**

## COUNTS 14 - 31
### 21 U.S.C. § 841(a)(1)
### 18 U.S.C. § 2

51.    On or about June 11, 2010, in Perry County, in the Eastern District of

Kentucky,

### JAMES ALVIN CHANEY, M.D.,
### aka ACE CHANEY, and
### ACE CLINIQUE OF MEDICINE, LLC,

aided and abetted by others, did knowingly and intentionally unlawfully distribute and

unlawfully dispense Schedule III controlled substances by having unauthorized

employees issue prescriptions in his absence using prescriptions that he had previously

signed in blank to each of the individuals listed below:

| Count | Recipient | Substance | Amount |
|-------|-----------|-----------|--------|
| 14 | V. S. | Hydrocodone | 90 |
| 15 | R. D. | Hydrocodone | 60 |
| 16 | D. S. | Hydrocodone | 150 |
| 17 | A.H. | Hydrocodone | 90 |
| 18 | D. S. | Hydrocodone | 60 |
| 19 | D. N. | Hydrocodone | 90 |
| 20 | B. N. | Hydrocodone | 120 |
| 21 | B.C. | Hydrocodone | 90 |
| 22 | B.F. | Hydrocodone | 120 |
| 23 | C.F. | Hydrocodone | 90 |
| 24 | P.S. | Hydrocodone | 90 |
| 25 | F.M. | Hydrocodone | 120 |
| 26 | K.C. | Hydrocodone | 60 |
| 27 | C.R. | Hydrocodone | 90 |
| 28 | G.I. | Hydrocodone | 90 |
| 29 | D.C. | Hydrocodone | 90 |
| 30 | S.T. | Hydrocodone | 60 |
| 31 | L.C. | Hydrocodone | 60 |

**EXHIBIT 2**

Contrary to 21 C.F.R. § 1306.05(a), and each count in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

### COUNTS 32 - 39
### 21 U.S.C. § 841(a)(1)
### 18 U.S.C. § 2

52.     On or about June 25, 2010, in Perry County, in the Eastern District of

Kentucky,

### JAMES ALVIN CHANEY, M.D.,
### aka ACE CHANEY, and
### ACE CLINIQUE OF MEDICINE, LLC,

aided and abetted by others, did knowingly and intentionally unlawfully distribute and

unlawfully dispense Schedule II controlled substances by having unauthorized employees

issue prescriptions in his absence using prescriptions that he had previously signed in

blank to each of the individuals listed below:

| Count | Recipient | Substance | Amount |
|-------|-----------|-----------|--------|
| 32 | B.B. | Oxycodone | 90 |
| 33 | D.E. | Oxycodone | 120 |
| 34 | L.G. | Oxycodone | 150 |
| 35 | W.H. | Oxycodone | 90 plus 60 |
| 36 | B.H. | Oxycodone | 120 |
| 37 | D.K. | Oxycodone | 120 |
| 38 | H.M. | Oxycodone | 60 |
| 39 | D.N. | Oxycodone | 120 |

Contrary to 21 C.F.R. § 1306.05(a), and each count in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

14

**EXHIBIT 2**